807 A.2d 198 (2002)
354 N.J. Super. 293
In the Matter of the PROTEST OF COASTAL PERMIT PROGRAM RULES.
In the Matter of the Challenge by the New Jersey Association of Realtors to Amendments of the Coastal Permit Program Rules and the Coastal Zone Management Rules.[1]
In the Matter of Coastal Permit Program Rules and Coastal Zone Management Rules Promulgated by New Jersey Department of Environmental Protection, N.J.A.C. 7:7E.
In the Matter of Coastal Permit Program Rules and Coastal Zone Management Rules Promulgated by New Jersey Department of Environmental Protection, N.J.A.C. 7:7E.
In the Matter of Amendments to the Coastal Permit Program Rules and Coastal Zone Management Rules.
Superior Court of New Jersey, Appellate Division.
Argued April 29, 2002.
Decided May 31, 2002.
*205 Paul H. Schneider argued the cause for appellant New Jersey Builders Association, Appeal No. A-3498-99T3 (Giordano, Halleran & Ciesla, attorneys; Michael J. Gross, of counsel; Mr. Schneider and Steven M. Dalton, Middletown, on the brief).
Richard M. Hluchan argued the cause for appellant, New Jersey Association of Realtors, Appeal No. A-3606-99T3 (Ballard Spahr Andrews & Ingersoll, attorneys; Mr. Hluchan and Richard S. Morrison, Voorhees, on the brief).
Thomas A. Borden argued the cause for appellants, Association of New Jersey Environmental Commissions and New Jersey Conservation Foundation, Appeal No. 3852-99T2 (Rutgers Environmental Law Clinic, attorneys, Marjorie Fox, on the brief).
Columbia Environmental Law Clinic, attorneys for appellants, American Littoral Society, New Jersey Environmental Federation, Pinelands Preservation Alliance and Sierra ClubNew Jersey Chapter, Appeal No. A-3853-99T3 (Edward Lloyd, Newark, on the brief).
Rutgers Environmental Law Clinic, attorney for appellants American Littoral Society, Sierra ClubNew Jersey Chapter, Pinelands Preservation Alliance, and New Jersey Environmental Federation, Appeal No. A-4250-00T3 (Thomas A. Borden, on the brief).
Szaferman, Lakind, Blumstein, Watter, Blader, Lehmann & Goldshore, attorneys for amicus curiae, New Jersey State League of Municipalities, Appeal No. 3853-99T3 (Lewis Goldshore, Plainsboro, on the brief).
Rachel Horowitz, Deputy Attorney General, argued the cause for respondent, New Jersey Department of Environmental Protection, Appeal Nos. A-3498-99T3, A-3606-99T3, 3852-99T3 (David Samson, Attorney General, attorney, Patrick DeAlmeida, Deputy Attorney General, of counsel; Ms. Horowitz, on the brief).
David Samson, Attorney General, attorney for respondent, New Jersey Department of Environmental Protection, Appeal Nos. 3853-99T3 and A-4250-00T3 (Patrick DeAlmeida, Deputy Attorney General, of counsel; Rachel Horowitz, Deputy Attorney General, on the brief).
Before Judges BRAITHWAITE, COBURN and WEISSBARD.

TABLE OF CONTENTS

Introduction........................................................205
 I. Background.....................................................207
 A. History of the CAFRA Legislation.............................207
 B. History of the CAFRA Regulations.............................209
 C. The Regulations at Issue.....................................211
 1. The Upland Waterfront Development Area....................211
 2. The CAFRA Area ...........................................212
 3. The State Plan, DEP, and Designated Boundaries............214
 II. Discussion....................................................219
 A. N.J.S.A. 7:7-1.4(b)..........................................219
 B. Sector Permit Program .......................................223
 1. Introduction..............................................223
*206
 2. Sector Permit Municipality..................................223
 3. Sector Permit Procedure.....................................224
 4. Standards for Issuing a Sector Permit.......................225
 C. Impervious Cover Regulations ..................................232
 1. Definition Not Arbitrary....................................232
 2. Adequacy of Numeric Limitations on
 Impervious Cover............................................233
 3. Lack of Coordination with State Plan........................236
 4. APA Violations..............................................237
 D. Overall Coordination with State Plan...........................237
 1. Appellants' Contentions.....................................237
 2. Too Little Coordination with State Plan.....................238
 3. Too Much Coordination with State Plan.......................238
 4. Lack of Technical or Factual Support for
 Coastal Centers' Delineation ...............................240
 5. Coastal Centers and the Fair Housing Act....................241
 6. Violations of the APA ......................................242
 E. Deed Restrictions .............................................245

The opinion of the court was delivered by BRAITHWAITE, J.A.D.
These five appeals, consolidated for purposes of this opinion, involve challenges by appellants New Jersey Association of Realtors ("Realtors"), New Jersey Builders Association ("Builders"), American Littoral Society, New Jersey Environmental Federation, Pinelands Preservation Alliance, Association of New Jersey Environmental Commissions, Sierra ClubNew Jersey Chapter, and New Jersey Foundation ("Environmental appellants") to the validity of regulations promulgated recently by respondent Department of Environmental Protection ("DEP") pursuant to the Coastal Area Facility Review Act ("CAFRA"), N.J.S.A. 13:19-1 to -21.
Appellants challenge a new permit program, the Sector Permit Program, N.J.A.C. 7:7-9.1 to -9.11, established by DEP in the Coastal Permit Program (CPP) Rules. The appeals also challenge DEP's changes to the location policies of the Coastal Zone Management ("CZM") Rules, N.J.A.C. 7:7E1.1 to -8.21, and the specific sub-chapters pertaining to "development intensity." Development intensity determines the allowable limits of impervious cover (structures and paving) that may be placed on a development site, and of vegetative cover (trees, shrubs, and grasses) that must be preserved or planted on a development site. The appeals also focus on DEP's repealing Subchapter 5 (General Land Areas) of N.J.A.C. 7:7E and its rewriting a new Subchapter 5 (Requirements for Impervious Cover and Vegetative Cover for General Land Areas and Certain Special Areas) and adding Subchapter 5A (Impervious Cover Limits and Vegetative Cover Percentages in the Upland Waterfront Development Area) and Subchapter 5B (Impervious Cover Limits and Vegetative Cover Percentages in the CAFRA Area).
Essentially, although there are other individual claims raised by the appellants that we will address, appellants' claims can be divided into four major themes:
 WHETHER N.J.A.C. 7:7-1.4(b) CONFLICTS WITH N.J.S.A. 13:19-10 BECAUSE IT ALLOWS DEP TO AVOID MAKING THE SPECIFICALLY ENUMERATED FINDINGS REQUIRED BY THE STATUTE BEFORE ISSUING A CAFRA PERMIT (raised by the Environmental appellants).
 WHETHER DEP'S SECTOR PERMIT PROGRAM, N.J.A.C. 7:7-9.1 *207 to -9.11, IS ULTRA VIRES (raised by the Environmental appellants).
 WHETHER THE IMPERVIOUS COVER PERCENTAGES IN N.J.A.C. 7:7E-5B.4 ARE ARBITRARY, CAPRICIOUS OR UNREASONABLE, OR WERE ADOPTED IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (APA), N.J.S.A. 52:14B-1 to -15 (raised by Builders, Realtors and Environmental appellants).
 WHETHER DEP ERRED BY USING THE STATE PLAN'S CENTERS OR BY CREATING ITS OWN COASTAL CENTERS (raised by Builders, Realtors and Environmental appellants).
Our careful review of the record convinces us that the regulations are valid with the exception of N.J.A.C. 7:7-1.4(b), and the sector permit rules, N.J.A.C. 7:7-9.1 to -9.11, to the extent that these regulations obviate the necessity of DEP making the findings required by N.J.S.A. 13:19-10 before issuing a permit. DEP is ordered to amend these regulations to make clear that it must make the necessary findings pursuant to N.J.S.A. 13:19-10 before it issues a permit.
In order to put the issues raised in perspective, we set forth the procedural history and statement of facts.

IBACKGROUND
A. HISTORY OF THE CAFRA LEGISLATION
In 1973, the Legislature enacted CAFRA "to protect the unique and fragile coastal zones of the State." In re Egg Harbor Assocs. (Bayshore Centre), 94 N.J. 358, 364, 464 A.2d 1115 (1983). See L. 1973, c. 185. That statutory framework first withstood constitutional attack in Toms River Affiliates v. Department of Envtl. Prot., 140 N.J.Super. 135, 355 A.2d 679 (App.Div.), certif. denied, 71 N.J. 345, 364 A.2d 1077 (1976). It was originally designed to control new large-scale residential development, energy facilities, commercial and industrial developments and certain types of public works projects.
Ten years later after CAFRA's enactment, the Supreme Court explained:
Through CAFRA, the Legislature intended to reverse "serious adverse environmental effects ... that would preclude or tend to preclude those multiple uses which support diversity and are in the best long-term, social, economic, aesthetic and recreational interests of all people of the State." N.J.S.A. 13:19-2. To achieve this goal, the Legislature determined that
all of the coastal area should be dedicated to those kinds of land uses which promote the public health, safety and welfare, protect public and private property, and are reasonably consistent and compatible with the natural laws governing the physical, chemical and biological environment of the coastal area.

[Id.]
....
Although CAFRA is principally an environmental protection statute, the powers delegated to DEP extend well beyond protection of the natural environment. Succinctly stated, the delegated powers require DEP to regulate land use within the coastal zone for the general welfare.
[Egg Harbor Assocs., supra, 94 N.J. at 364, 464 A.2d 1115.]
In 1993, the Legislature significantly amended CAFRA, expanding its jurisdiction. L. 1993, c. 190. Those amendments substantially changed the thresholds for *208 the issuance of development permits in order to better accommodate urban redevelopment and to provide for greater protection for the sensitive coastal areas at the water's edge. See committee statement at the end of N.J.S.A. 13:19-2 (West Supp.2002).
The jurisdictional expansion was also noted by DEP when it readopted and revised its regulations in response to the Legislature's amendments. 26 N.J.R. 2934-90 (July 18, 1994). As part of that adoption, N.J.A.C. 7:7-2.1 was amended to state in pertinent part:
(b) The Department interprets its obligation and responsibility to regulate development as defined by CAFRA to include review of the potential impacts of any development, if at least part of that development is located within the area in which a CAFRA permit is required. Therefore, if any development requires a CAFRA permit, the Department will review all the components of the development, not just those that triggered the regulatory thresholds of CAFRA....
At its heart, CAFRA requires that any proposed development within the State's "coastal area" that meets the initial construction and development thresholds articulated in N.J.S.A. 13:19-5 must obtain a permit from DEP before the commencement of that construction unless otherwise expressly exempted. N.J.S.A. 13:19-5, 13:19-5.2, and 13:19-5.3. CAFRA's "coastal area" is defined in N.J.S.A. 13:19-4 as generally extending along the State's coast from Cheesequake Creek along Raritan Bay south along the Atlantic Ocean to Cape May and then north along the Delaware Bay and River to the Kilcohook National Wildlife Center in Salem County. "It ranges in width from as little as about 100 feet to as much as about 20 miles." See 31 N.J.R. 2042 (August 2, 1999).
In enacting and amending CAFRA, the Legislature declared in part in N.J.S.A. 13:19-2
that the coastal area and the State will suffer continuing and ever-accelerating serious adverse economic, social and aesthetic effects unless the State assists, in accordance with the provisions of this act, in the assessment of impacts, stemming from the future location and kinds of developments within the coastal area, on the delicately balanced environment of that area.
The Legislature further recognizes the legitimate economic aspirations of the inhabitants of the coastal area and wishes to encourage the development of compatible land uses in order to improve the overall economic position of the inhabitants of that area within the framework of a comprehensive environmental design strategy which preserves the most ecologically sensitive and fragile area from inappropriate development and provides adequate environmental safeguards for the construction of any developments in the coastal area.

[Emphasis added.]
The Legislature also gave DEP power to promulgate new regulations to "effectuate the purposes of this act." N.J.S.A. 13:19-17(a).
In the 1993 amendments, the Legislature added N.J.S.A. 13:19-17(b), which requires that DEP adopt regulations in consultation with the State Planning Commission[2] and local governments, and *209 that the CAFRA regulations be "closely coordinated" with the provisions of the State Plan. N.J.S.A. 13:19-17(b) states:
Within one year of the enactment date of P.L.1993, c. 190 (C. 13:19-5.1 et al.), the department, in consultation with the State Planning Commission and county and municipal governments located in the coastal area ... shall adopt new rules and regulations to implement P.L. 1993, c. 190.... Any rules or regulations adopted pursuant to this subsection shall be closely coordinated with the provisions of the State Development and Redevelopment Plan adopted pursuant to P.L.1985, c. 398 (C. 52:18A-196 et seq.) and the federal "Coastal Zone Management Act of 1972," 16 U.S.C. § 1451 et seq.

[Emphasis added.]
At the same time, the Legislature also authorized the State Planning Commission to adopt the coastal planning policies of DEP's regulations as the State Plan for the coastal area. N.J.S.A. 52:18A-206(b) of the State Planning Act states, in part:
The State Planning Commission may adopt ... the coastal planning policies of the rules and regulations adopted pursuant to ... [CAFRA], the coastal planning policies of the rules and regulations adopted pursuant to ... [N.J.S.A. 13:19-17(b) ] and any coastal planning policies of rules and regulations adopted pursuant to [CAFRA] thereafter as the State Development and Redevelopment Plan for the coastal area....

[L. 1993, c. 190, § 19.]
Additionally in 1993, the Legislature repealed a CAFRA statute that directed DEP to develop a long-term environmental management strategy for the coastal area. This repealed provision had required the Commissioner of DEP to prepare an environmental inventory, an estimate of the capability of the coastal area to absorb and react to manmade stresses, and an environmental design strategy for the coastal area. N.J.S.A. 13:19-16, repealed by L. 1993, c. 190, § 2 (effective July 19, 1994).
B. HISTORY OF THE CAFRA REGULATIONS
DEP executes its statutory authority under CAFRA through the Coastal Permit Program (CPP) Rules at N.J.A.C. 7:7, and the Coastal Zone Management (CZM) Rules at N.J.A.C. 7:7E. Both sets of regulations implement CAFRA, as well as the Wetlands Act of 1970, N.J.S.A. 13:9A-1 to -10, and the Waterfront Development Law, N.J.S.A. 12:5-3 to -11. N.J.A.C. 7:7-1.1 and 7:7E-1.1.
The CPP Rules contain the procedures for reviewing coastal permit applications and for enforcing violations. In contrast, the CZM Rules contain the substantive standards for determining development acceptability and the environmental impact of projects for which coastal permits are submitted.
In December 1997, in response to the Legislature's 1993 CAFRA amendments, DEP released the text of draft rules for new sweeping amendments to N.J.A.C. 7:7 and 7:7E; this was referred to as the Interested Party Review, and DEP asked for even further public comment. 29 N.J.R. 5041 (December 1, 1997).
In December 1998, DEP published a reproposal of its new CAFRA regulations. 30 N.J.R. 4167-203 (December 7, 1998). DEP received many comments, and it held four formal public hearings throughout the *210 State. See 31 N.J.R. 2045 (August 2, 1999) (recounting the history of the regulations). DEP again extended the public comment period and held additional meetings with the building community, environmental groups, county planning offices, and municipalities in the affected areas. Ibid.
DEP did not adopt those rules as proposed. Instead, in August 1999, DEP again substantially modified and republished its proposal in response to concerns and issues raised during the comment periods. 31 N.J.R. 2042-99 (August 2, 1999) (proposal). On February 7, 2000, DEP adopted those proposals with modifications. 32 N.J.R. 503-95 (February 7, 2000) (adoption).
At this time, DEP adopted the Sector Permit Program at N.J.A.C. 7:7-9.1 to -9.11. 32 N.J.R. 503-95 (February 7, 2000) (adoption). DEP's goals for adopting the program were to: "(1) establish a more timely and predictable regulatory process; (2) ensure that plans and regulations are compatible between local, regional and State agencies; (3) ensure that planning precedes and guides regulatory activities; and (4) eliminate duplication in planning and regulatory activities." 31 N.J.R. 2046 (August 2, 1999).
However, additionally on February 7, 2000, DEP proposed new amendments to the rules that it had just promulgated on that day. 32 N.J.R. 352-63 (February 7, 2001) (proposal). These amendments expanded the scope of the program to all CAFRA-development within an entire "sector permit municipality" and updated the certification and re-certification process for qualifying municipalities. Id. at 352. On March 5, 2001, DEP adopted those proposals with substantive and technical changes not requiring additional public notice and comment. 33 N.J.R. 843-69 (March 5, 2001) (adoption).
Pursuant to the Sector Permit Program, "a CAFRA-regulated development shall be authorized through the municipal approval process, subject to concurrent [DEP] review and oversight, if the development meets the requirements of N.J.A.C. 7:7-9.3 and if the applicant seeking authorization for the development fulfills the notification requirements at N.J.A.C. 7:7-9.7." N.J.A.C. 7:7-9.1(c) (purpose and scope). In other words, the sector permit municipality authorizes the development in lieu of a separate DEP CAFRA permit, while DEP concurrently reviews and oversees the process. DEP has described the procedure as follows:
Under the sector permit, the municipal government does not conduct a "CAFRA review." It reviews a CAFRA-regulated development application for consistency with its land use ordinances, which, in accordance with N.J.A.C. 7:7-9.4, must regulate the development to the same extent it would be regulated under CAFRA and the rules. Also, the Department will concurrently review each CAFRA application to ensure that it meets the requirements of the sector permit.

[33 N.J.R. 846.]
Meanwhile, in October 2000, DEP had (1) adopted further amendments to the definitions, jurisdiction and application procedures in its regulations, (2) added various new types of permits, and (3) changed the rules concerning various coastal zone areas. 32 N.J.R. 3784-828 (October 16, 2000) (adoption); 32 N.J.R. 864-932 (March 20, 2000) (proposal).
In May 2001, DEP adopted amendments to certain specified land boundaries in Appendix 2 of N.J.A.C. 7:7E. 33 N.J.R. 1371-77 (May 7, 2001) (adoption); 33 N.J.R. 156-59 (January 16, 2001) (proposal).
In November 2001, the Commissioner of DEP published his intent to amend and *211 readopt various regulations in the CZM Rules, N.J.A.C. 7:7. 33 N.J.R. 3566 (October 1, 2001). In fact, in January 2002, DEP published proposed amendments to various regulations, including many in N.J.A.C. 7:7 and 7:7E. 34 N.J.R. 74-170 (January 7, 2002) (proposal). The comment period closed on March 8, 2002, and no adoption has yet been published in the New Jersey Register. The Commissioner published his intent to have the adoption completed in April 2002. 34 N.J.R. 322 (January 7, 2002).
C. THE REGULATIONS AT ISSUE
In 2000, DEP substantially amended its regulations in N.J.A.C. 7:7 and 7:7E by repealing Subchapter 5 of N.J.A.C. 7:7E and rewriting the entire section in addition to adding Subchapters 5A and 5B. 31 N.J.R. 2042; 33 N.J.R. 843. DEP stated that its primary objective was "to replace a site-by-site decision-making process for developments within the CAFRA area with a permit decision-making process that reflects an inclusive planning effort." 31 N.J.R. 2043.
These subchapters apply to all development on the general land areas and to all development on some of the special land areas, unless otherwise stated in the specific special-land-area regulations. N.J.A.C. 7:7E-5.1(c). Subchapters 5, 5A and 5B, however, do not affect single-family-home or duplex developments or those situations when a developed site will be redeveloped at its legally existing coverage. N.J.A.C. 7:7E-5.1(d).
Under the new regulations in Subchapter 5, DEP first makes a distinction between the "upland waterfront development area" and the "CAFRA area." In fact, the methodologies for determining the percentages of impervious cover and vegetative cover are based on this initial distinction.
DEP defines the "CAFRA area" as the "coastal area" defined in N.J.S.A. 13:19-4. N.J.A.C. 7:7E-5.2 (definitions). The "upland waterfront development area" includes all lands inland of the CAFRA area extending from the mean high water line of a tidal water body to the first paved public road, railroad or surveyable property lines existing on September 1980, but no less than 100 feet and no more than 500 feet from the mean high water line. N.J.A.C. 7:7E-5.2 (definitions).
N.J.A.C. 7:7E-1.5 states that "impervious cover"
means any structure, surface, or improvement that reduces and/or prevents absorption of stormwater into land. Porous paving, paver blocks, gravel, crushed stone, crushed shell, elevated structures (including boardwalks), and other similar structures, surfaces, or improvements are considered impervious cover. Grass, lawns, or any other vegetation are not considered impervious cover.
1. The Upland Waterfront Development Area
The methodology for determining impervious cover and vegetative cover percentages for sites in the "upland waterfront development area" is found in new Subchapter 5A, N.J.A.C. 7:7E-5A.1 to -5A.10, and it has not substantially changed from the historical methodology used to determine "development intensity" for all sites in the prior regulations. That is, three specific regulatory factorsgrowth rating, environmental sensitivity, and development potentialare first ascertained for the site in the upland waterfront development area. N.J.A.C. 7:7E-5A.1 to -5A.7. Once those factors are determined, DEP plugs them into tables found at N.J.A.C. 7:7E-5A.8 to determine the acceptable "development intensity" (high, medium or low) for that site or smaller parts of that *212 site. Thereafter, DEP plugs the development intensity into the applicable tables in N.J.A.C. 7:7E-5A.9 and -5A.10 to ascertain the impervious cover and vegetative cover percentages for a site, forested or unforested, in the upland waterfront development area. The main difference between the new and old regulations is that the percentages themselves have changed in N.J.A.C. 7:7E-5A.9 and -5A.10.
In the end, maximum impervious cover percentages and minimum vegetative cover percentages for proposed developments in the upland waterfront development area are still based on the final combination of three separate indices to determine development intensity and on whether the site is forested or unforested:

 Development in the Upland Waterfront Development Area For a
 Forested SiteN.J.A.C. 7:7E-5A.9[3]
 ---------------------------------------------------------------------------------
 Vegetative Cover (min.amt.)
 -------------------------------------------
 Tree
 Impervious Preservation
 Development Cover and/or New
 Intensity (max. amt.) Tree Preservation Planting
 ---------------------------------------------------------------------------------
 High 70% 25% 5%
 ---------------------------------------------------------------------------------
 Medium 40% 25% 5%
 ---------------------------------------------------------------------------------
 Low 5% 30% 0
 ---------------------------------------------------------------------------------
 Development in the Upland Waterfront Development Area For an
 Unforested Site
 ---------------------------------------------------------------------------------
 Vegetative Cover
 (min.amt.)
 --------------------
 Tree Preservation
 Impervious Cover and/or New
 Development Intensity (max.amt.)[4] Planting
 ---------------------------------------------------------------------------------
 High (in urban area) 90% 5%
 -------------------------------------------------------
 High (not in urban area) 80%
 ---------------------------------------------------------------------------------
 Medium 40% 20%
 ---------------------------------------------------------------------------------
 Low 5% 5%
 ---------------------------------------------------------------------------------

2. The CAFRA Area
The methodology for determining impervious cover and vegetative cover percentages for sites in the "CAFRA area" is found in new Subchapter 5B, N.J.A.C. 7:7E-5B.1 to -5B.5, and is completely different from the old methodology and from the methodology for sites in the upland waterfront development area.
For a site in the CAFRA area, both the impervious cover and vegetative cover percentages are solely based on where the *213 site is located on the CAFRA Planning Map; that is, in which one or more of the following four specific categories or centers: (1) a coastal center; (2) a Coastal Planning Area; (3) a CAFRA center, CAFRA core or CAFRA node; or (4) a military installation. N.J.A.C. 7:7E-5B.1(a); N.J.A.C. 7:7E-5.1(a)(2). A site in the CAFRA area may include land in more than one category, and the cover percentages appropriate to each category apply to those particular portions of the site. N.J.A.C. 7:7E-5B.3(I).
In other words, rather than determining the acceptable intensity of development on a site by considering a complex of factors such as patterns of existing development, natural and cultural resources, environmental sensitivity, existing infrastructure, and soil type, the new rules establish impervious cover limits and vegetative cover requirements for development sites that reflect where a site is located. The State Planning Commission's centers that DEP has accepted as its CAFRA centers on the CAFRA Planning Map are listed in Appendix 4 of N.J.A.C. 7:7E. 33 N.J.R. 869.
In its 1998 reproposal of the CAFRA regulations, DEP created its own interim "coastal centers". 30 N.J.R. 4167-203 (December 7, 1998). "Coastal centers" are defined in N.J.A.C. 7:7E-5.2 as
a center in the CAFRA area with a boundary delineated by the Department for the purpose of applying the requirements for impervious cover and vegetative cover at N.J.A.C. 7:7E-5 and 5B until such time as, in accordance with N.J.A.C. 7:7E-5B.3, the coastal center expires or is superseded by the CAFRA center.

[Emphasis added.]
DEP explained the purpose of delineating its own coastal centers as follows:
Coastal centers were included in the Coastal Zone Management rules to facilitate on an interim basis the permitting of CAFRA-regulated development in a manner consistent with the goals of the State Development and Redevelopment Plan. However, coastal centers generally do not meet the criteria established in the State Plan for size, density, dwelling units, population and other factors. Although coastal centers may not meet those State Development and Redevelopment center criteria, coastal centers were established to accommodate planned, imminent development identified by local officials....
The Department expects that municipalities will examine the coastal center delineations in relation to their own planning efforts and development and redevelopment issues, and in many cases, seek a different community development boundary and formal center designation or plan endorsement by the State Planning Commission. Under the Coastal Zone Management rules, the State Planning Commission approved boundaries are then subject to Department review for consistency with the CAFRA statute and rules. If the Department accepts the State Planning Commission approved boundaries, then the center is incorporated into the Coastal Zone Management rules and CAFRA Planning Map as a CAFRA center.

[33 N.J.R. 1375 (May 7, 2001).]
DEP also sought input from coastal municipalities and counties, asking them to identify coastal areas in their own boundaries. In fact, DEP extended its February 1999 deadline to April 1999 for CAFRA area communities to identify themselves as candidates to become eligible for delineation as a "coastal center." 31 N.J.R. 93 (January 19, 1999).
*214 Previously, in December 1998, DEP published a public notice that listed a procedure by which municipalities could identify to DEP places that should be considered as Coastal centers. 30 N.J.R. 4283-84 (December 7, 1998). DEP stated that it would only consider delineating a Coastal center for a community if that community had existing development and was listed in a report that had been filed with the State Planning Commission. 30 N.J.R. 4283.
The other specific CAFRA area categories are defined in N.J.A.C. 7:7E-5.2, as follows:
"Center" means a compact form of development which may have one or more cores and residential neighborhoods. A center may be [one of five types: (1) ] an urban center, [ (2) ] regional center, [(3) ] town, [ (4) ] village, or [ (5) ] hamlet, based on factors such as comparative size, population density, total population, transportation access, infrastructure, and employment base.
....
"Core" means a pedestrian-oriented area of commercial and civic uses serving the surrounding municipality or center, generally including some housing and access to public transportation.
....
"Node" means a concentration of facilities and activities which are not organized in a compact form.
"Planning area" means an area of greater than one square mile that shares a common set of conditions such as population density, infrastructure systems, level of development, or environmental sensitivity. The five types of planning areas are [ (1) ] Metropolitan Planning Area, [ (2) ] Suburban Planning Area, [(3) ] Fringe Planning Area, [ (4) ] Rural Planning Area, and [ (5) ] Environmentally Sensitive Planning Area.
Once the specific location of a site is determined, the gross or net land area of that site is multiplied by the percentages listed in the tables at N.J.A.C. 7:7E-5B.4 and -5B.5 to compute the impervious cover and vegetative cover percentages.
N.J.A.C. 7:7E-5B.3 defines the boundaries of the various land area categories. To determine the boundaries of coastal planning areas, CAFRA centers, CAFRA cores and CAFRA nodes, DEP rejected its existing coastal Growth Ratings Maps and created a CAFRA Planning Map. DEP accepted in total the boundaries of the Planning Areas, Centers, Cores and Nodes approved by the State Planning Commission as the boundaries of its Coastal Planning Areas, CAFRA centers, CAFRA cores and CAFRA nodes. N.J.A.C. 7:7E-5B.3(a).
3. The State Plan, DEP, and Designated Boundaries
In 1992, the State Planning Commission adopted the State Plan and delineated the entire State using five main and distinct "Planning Areas," which are large masses of land (greater than one mile) that share a common set of conditions.[5]See N.J.A.C. 17:32-1.4 (definition of Planning Area). Smaller sections in these Planning Areas were conceived of as "Centers," wherein new and old growth could be organized into compact development and surrounded by carefully controlled environs. There are five types of "centers" *215 ranging in scale: urban centers, regional centers, towns, village and hamlets. See N.J.A.C. 17:32-1.4 (definition of Center). Inside centers are "Cores" (the commercial, cultural and civic heart of a center, generally including housing and access to public transportation) and "Nodes" (a concentrated area of facilities and activities, which is not organized in a compact form). See N.J.A.C. 17:32-1.4 (definitions of Core and Node).
By way of a brief summary, the five Planning Areas of the State Plan are: (1) the Metropolitan Planning Area, which consists of urban centers and older suburbs with little vacant land, and where growth would be in the form of redevelopment even outside designated Centers; (2) the Suburban Planning Area, which provides for most of the future development, which can take place even outside designated Centers; (3) the Fringe Planning Area, which provides a buffer between the more developed Planning Areas and the less developed Planning Areas, and where development is restricted to Centers; (4) the Rural Planning Area, which consists of countryside or farmland with large areas of cultivated or open land surrounding sparse residential, commercial and industrial sites, and where all development is restricted to Centers; and (5) the Environmentally Sensitive Planning Area, which contains large contiguous land areas with valuable resources, and where all development is restricted to Centers.
Under the State Plan, however, centers, cores and nodes are not initially delineated by the State Planning Commission. Instead, through a "voluntary" or "recommended" process, which was called "center designation" and is now called "Plan Endorsement" (34 N.J.R. 285[6]), only municipal and county governing bodies and regional and state agencies may petition or bring their plans, which include boundaries of these areas, to the Commission for endorsement. N.J.A.C. 17:32-7.2(a).[7] Endorsement is a regulatory process that includes public notice, public hearings, meetings and comment periods. N.J.A.C. 17:32-7.3 to -7.8. Petitions to amend endorsed plans may be submitted only by counties, municipalities, and regional and state agencies. N.J.A.C. 17:32-7.12(b).
After endorsement, the designated boundaries in an endorsed plan are incorporated onto the State Planning Commission's State Plan Policy Map. Thereafter, during the actual application of the endorsed plan, private citizens and organizations, in addition to governmental entities, may petition for amendments or minor amendments to that map. N.J.A.C. 17:32-8.2; N.J.A.C. 17:32-8.3; N.J.A.C. 17:32-8.7.
The boundaries of the "coastal centers" that DEP has already delineated are specifically listed in Appendices 2 and 3 of N.J.A.C. 7:7E, and are not influenced by the State Planning Commission. Appendix 2 lists boundaries of seventy-eight mainland coastal centers in the CAFRA area not located on barrier islands, oceanfront spits, or peninsulas, and Appendix 3 lists boundaries of twenty-three coastal centers in the CAFRA area that are located on barrier islands, oceanfront spits, or peninsulas. The boundaries of the coastal *216 centers in Appendix 2 will expire in February 2005, and those areas will be treated as the other land categories in the State Plan. N.J.A.C. 7:7E-5B.3(g).
DEP explained its use of the State Plan's boundaries as follows:
The Department's planning in the CAFRA area has historically relied on broad, regional boundaries to distinguish rural and environmentally sensitive areas from developed and potential growth areas in order to determine appropriate impervious cover and vegetative cover requirements. Similarly, the State Planning Commission has established boundaries for Planning Areas, which are large masses of land distinguished by certain overall characteristics such as population density, land use, and environmentally sensitive features. The State Planning Commission also approves community development boundaries for centers, which are areas into which development is already or should be directed and concentrated, and recognizes cores and nodes as areas of already concentrated development either as part of centers or in the more heavily developed areas of the State. The factors that the State Planning Commission uses to formally approve centers, cores, and nodes are not unlike the factors which the Department has historically relied on to determine a site's development intensity under the existing Coastal Zone Management rules. Most significantly, the State Plan boundaries for Planning Areas, centers, cores and nodes were drawn after a lengthy public process that extended over a five-year period, included hundreds of meetings among municipal, county, and State officials, and involved the submittal of thousands of documents from public officials and private organizations and individuals.

[31 N.J.R. 2044.]
[T]he Department carefully examined those boundaries, the purposes for which they were established, and the factors that determined how the lines were drawn in order to determine whether the Department could utilize the boundaries under CAFRA. Based on its examination, the Department has determined that the boundaries drawn by the State Planning Commission were established and drawn to serve many of the same purposes as the Department's boundaries under the Coastal Zone Management rules for the CAFRA area. The State Planning Commission boundaries are in keeping with the purposes of the CAFRA statute, which include the "encourage[ment of] the development of compatible land uses in order to improve the overall economic position of the inhabitants of [the CAFRA] area within the framework of a comprehensive environmental design strategy which preserves the most ecologically sensitive and fragile area from inappropriate development and provides adequate environmental safeguards for the construction of any developments in the [CAFRA] area." (See N.J.S.A. 13:19-2.) Therefore, by virtue of its authority under the CAFRA statute, the Department has determined to substitute the State Planning Commission boundaries for its own in the CAFRA area, by incorporating by reference into these proposed rules the State Plan structure of Planning Areas and designated centers. The Department has determined that this is an appropriate way to closely coordinate the standards for CAFRA permitting with the State Plan.

[30 N.J.R. 4168. Accord 31 N.J.R. 2044.]
When the State Planning Commission formally approves any new or changed *217 boundary to the State Plan, N.J.A.C. 7:7E-5B.3 requires that DEP evaluate the boundary to determine whether it is consistent with the purposes of CAFRA, and then publish a notice of its intention to accept it, reject it, or subsequently promulgate a revised boundary in the CAFRA Planning Map.[8] The standards governing DEP's review are set forth in N.J.A.C. 7:7E-5B.3(b):
The Department shall not reject or reject and revise a boundary unless it finds that accepting the State Planning Commission approved boundary would result in unacceptable harm to the coastal ecosystem or the resources of the built or natural environment, or would otherwise be clearly inconsistent with the purposes of the Coastal Area Facility Review Act, N.J.S.A. 13:19-1 et seq., or this chapter. For those new or changed community development boundaries or new or changed core or node boundaries which are located within the Pinelands National Reserve, the Department shall also, in consultation with the New Jersey Pinelands Commission, determine whether the boundaries are consistent with the intent, policies and objectives of the National Parks and Recreation Act of 1978, P.L. 95-625, section 502, creating the Pinelands National Reserve, and the State Pinelands Protection Act of 1979 (N.J.S.A. 13:18A-1 et seq.).
N.J.A.C. 7:7E-5B.3(e) states that DEP may reject or chose to modify the State Planning Commission's formally approved new or changed boundary "by promulgating an amendment to this chapter in accordance with the Administrative Procedure Act ["APA"], N.J.S.A. 52:14B-1 [to -15]." In any case, DEP must publish in the New Jersey Register a notice of its determination to accept, reject, or reject and revise the boundary "[w]ithin 90 calendar days after the date on which the State Planning Commission formally approves such boundary." N.J.A.C. 7:7E-5B.3(b).
On March 1, 2001, the State Planning Commission readopted the State Development and Redevelopment Plan and a new State Plan Policy Map to replace the prior map. See 33 N.J.R. 2347 (July 2, 2001). In response to that action, in a July 2001 public notice, DEP declared that it had accepted some and rejected some of the planning area boundary changes that had been formally approved by the State Planning Commission. 33 N.J.R. 2347-48 (July 2, 2001).
The bottom line for sites in the CAFRA area is that impervious cover and vegetative cover percentages for a proposed development are based on where the site is located on the CAFRA Planning Map. By way of summary:
A. For impervious cover (see N.J.A.C. 7:7E-5B.4):

*218 If a site is located in a CAFRA center, CAFRA core or CAFRA nodetake the higher amount of (1) the acreage of the total land area multiplied by the percentage listed on the following table or (2) the amount of existing cover.
If the site is located in the Coastal Metropolitan Planning Area or in a coastal centertake the higher amount of (1) the acreage of the net land area (i.e., land remaining after subtracting any "special areas" such as wetlands or habitat for threatened or endangered species) multiplied by the percentage listed on the following table or (2) the amount of existing cover.
If the site is not located in a CAFRA center, CAFRA core, CAFRA node, Coastal Metropolitan Planning Area, or coastal centertake the higher amount of (1) the acreage of the net land area multiplied by the percentage listed on the following table or (2) the amount of existing cover.
B. For vegetative cover (see N.J.A.C. 7:7E-5B.5):
Determine the location of the site on the following table and then multiply the acreage of the net land area by the percentages listed on the following table.

 Development in the CAFRA Area[9]
 ----------------------------------------------------------------------------------
 Vegetative Cover (min.amt.)
 --------------------------------
 Tree
 Preservation
 Tree and/or New
 Impervious Preservation Planting for
 Cover for forested unforested
Site Location (max.amt.) portion portion
 ----------------------------------------------------------------------------------
 CAFRA urban center 90% 10% 0
 ----------------------------------------------------------------------------------
 CAFRA regional center 80% 10% 0
 ----------------------------------------------------------------------------------
 Coastal regional center 70% 10% 0
 ----------------------------------------------------------------------------------
 CAFRA core/
 CAFRA node 70% 10% 0
 ----------------------------------------------------------------------------------
 CAFRA town/
 Coastal town 70% 25% 0
 ----------------------------------------------------------------------------------
 Military installation 70% 10% 0
 ----------------------------------------------------------------------------------
 CAFRA village/
 Coastal village 60% 30% 5%
 ----------------------------------------------------------------------------------
 CAFRA hamlet/
 Coastal hamlet 50% 40% 5%
 ----------------------------------------------------------------------------------
 Coastal Metropolitan
 Planning Area 80% 10% 0
 ----------------------------------------------------------------------------------
 Coastal Suburban
 Planning Area, within
 a sewer service area 30% 35% 5%
 ----------------------------------------------------------------------------------
 Coastal Suburban
 Planning Area, outside
 a sewer service area 5% 70% 5%
 ----------------------------------------------------------------------------------
 Coastal Fringe Planning
 Area 5% 70% 5%

*219
 ----------------------------------------------------------------------------------
 Coastal Rural Planning
 Area 3% 70% 5%
 ----------------------------------------------------------------------------------
 Coastal Environmentally
 Sensitive Planning Area 3% 70% 5%
 ----------------------------------------------------------------------------------

In general, higher impervious cover limits are allowed for sites within a CAFRA center, CAFRA core, CAFRA node, or coastal center than for those areas outside of a center. Moreover, as indicated by the CAFRA Planning Map, Metropolitan Planning Areas are only located in the coastal area within Monmouth County and Atlantic County, Suburban Planning Areas extend into Monmouth and Ocean Counties and portions of Atlantic and Salem Counties (and many of those lack sewer service), and the balance of the coastal area comprises Fringe, Rural and Environmentally Sensitive Planning Areas.
By way of example, DEP estimated that a site in an impervious cover zone of thirty percent would yield one home per half-acre lot, whereas that same home in an impervious cover zone of five percent would need a lot of three to five acres, and in an impervious cover zone of three percent would need a lot of six to ten acres. 32 N.J.R. 546.
It is noted that DEP recently proposed amendments to, among other things, the impervious cover limits in N.J.A.C. 7:7E-5B.4. 34 N.J.R. 322 (January 7, 2002) (schedule); 34 N.J.R. 74-170 (proposal). Specifically, DEP proposed to amend the impervious cover requirement for CAFRA centers, CAFRA cores and CAFRA nodes located in the Coastal Metropolitan Planning Area, to provide that the impervious cover limit is the higher amount of: (1) the acreage of the total land area on site multiplied by the impervious cover percentage in the table for the type of CAFRA center, CAFRA core or CAFRA node in which the site is located; or (2) the amount of existing impervious cover located on the site; or (3) the acreage of the net land area on the site multiplied by the impervious cover percentage in the table for the Coastal Metropolitan Planning Area, which is eighty percent. 34 N.J.R. 104. DEP explained that, under this proposal, "the impervious cover limit for a CAFRA village located outside of the Coastal Metropolitan Planning Area would be 60 percent of the total land area or the amount of legal, existing impervious cover located on the site, while the impervious cover limit for a CAFRA village located in a Coastal Metropolitan Planning Area would be 60 percent of the total land area, or the amount of legal, existing impervious cover located on the site, or 80 percent of the net land area, if that were higher." 34 N.J.R. 104.

IIDISCUSSION
A. N.J.S.A. 7:7-1.4(b)
Environmental appellants contend that DEP's regulations allow it to avoid compliance with the requirements mandated by the Legislature in CAFRA. Specifically, appellants object to newly adopted N.J.A.C. 7:7-1.4(b). They argue that the regulation conflicts with N.J.S.A. 13:19-10 because it allows DEP to avoid making the specifically enumerated findings required by the statute before issuing a CAFRA permit.
N.J.A.C. 7:7-1.4(b) states:
The Department shall not issue a permit under CAFRA unless the application complies with all of the policy and substantive standards of N.J.S.A. 13:19-2 and 13:19-10 as expressed in the Coastal Zone Management rules at N.J.A.C. 7:7E.
*220 Appellants argue that N.J.A.C. 7:7-1.4(b), by cross-referencing N.J.A.C. 7:7E, and using the limiting language "as expressed in," allows DEP to circumvent making the findings pursuant to N.J.S.A. 13:19-10 when it grants a CAFRA permit.
DEP maintains that the CZM Rules at N.J.A.C. 7:7E implement N.J.S.A. 13:19-10, and therefore the statute will be met automatically when any CAFRA permit is approved in accordance with the CZM Rules. DEP lists the eight subchapters of regulations in the CZM Rules, claiming that those rules in their totality obtain the results envisioned by the findings required in N.J.S.A. 13:19-10.
Appellants argue that the specific standards expressed in N.J.S.A. 13:19-10 are "simply not in the regulations at N.J.A.C. 7:7E" and that DEP cannot maintain that it is complying with the statutory requirements merely through implementation of the CZM Rules. Appellants cite various examples to show that the standards in the CZM Rules are allegedly less stringent than the standards in N.J.S.A. 13:19-10. Appellants, however, do not object to these regulations per se. Rather, they use these regulations merely as illustrations to show that the "words" of the standards in the regulations do not mirror those in the statute. Thus, appellants insist that, to ensure compliance with the CAFRA statutes, DEP must apply the rules at N.J.A.C. 7:7E and, additionally, must make the mandatory findings under N.J.S.A. 13:19-10 for each issued permit. Consequently, appellants assert that DEP has two options: (1) adopt a regulation which cross-references the specific standards in N.J.S.A. 13:19-10 and requires an agency to make the findings under the statute, or (2) amend the CZM Rules to include the specific standards in N.J.S.A. 13:19-10.
On February 7, 2000, DEP proposed N.J.A.C. 7:7-1.4(b). 32 N.J.R. 352 (February 7, 2000). It declared that
[t]his provision, in which the Department is proposing to include language that specifies the standards under which a CAFRA permit may be granted, is being proposed in response to concerns that the newly adopted rules do not reference all of the purposes of CAFRA and all of the standards contained in the CAFRA legislation for reviewing development applications. This proposed amendment will continue to ensure that CAFRA-regulated developments cause minimal environmental impacts and are consistent with CAFRA goals. It also emphasizes that approved permits are consistent with the policies and intent of CAFRA.

[32 N.J.R. 353.]
DEP received various comments on this regulation, specifically from appellants, who presented the same arguments they make here. 33 N.J.R. 844. In its response, DEP answered:
The adopted rule provides at N.J.A.C. 7:7-1.4(b) that a permit applicant's failure to comply with the policy and the standards for permit issuance in the CAFRA statute at N.J.S.A. 13:19-2 and N.J.S.A. 13:19-10 as expressed in the Coastal Zone Management rules will result in permit denial. The Department complies with N.J.S.A. 13:19-10 through implementation of the Coastal Zone Management rules, as well as through implementation of other regulatory programs, such as the water allocation program. The water allocation permit review process evaluates whether there is sufficient groundwater supply, considers all applicable rules on groundwater withdrawal and water diversion privileges, and addresses issues related to salt water intrusion and aquifer recharge.

*221 N.J.A.C. 7:7-1.4(b) does not allow the applicant to determine if its application meets these standards. The Department reviews the application and supporting documentation and then determines whether the application meets the standards. The section expressly incorporates into the rules the statutory mandate that the Department already implements, that is, ensuring that issued permits are consistent with the relevant policies and substantive standards in N.J.S.A. 13:19-2 and 10.

[33 N.J.R. 844.]
Administrative regulations are presumed to be valid. New Jersey State League of Municipalities v. Department of Cmty. Affairs, 158 N.J. 211, 222, 729 A.2d 21 (1999). They are also accorded a presumption of reasonableness. A.A. Mastrangelo, Inc. v. Commissioner of Dep't of Envtl. Prot., 90 N.J. 666, 683, 449 A.2d 516 (1982). A finding of ultra vires action is disfavored. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561, 384 A.2d 795 (1978).
Furthermore, our courts ordinarily recognize that an agency's specialized expertise renders it particularly well-equipped to understand the issues and enact the appropriate regulations pertaining to the technical matters within its area. New Jersey State League of Municipalities, supra, 158 N.J. at 222, 729 A.2d 21. Deference to an administrative agency is especially appropriate when new and innovative legislation is being put into practice. Newark Firemen's Mut. Benevolent Ass'n, Local No. 4 v. City of Newark, 90 N.J. 44, 55, 447 A.2d 130 (1982). Thus, in general, if procedurally regular, a regulation may be set aside only if it is proved to be arbitrary or capricious, or if it plainly transgresses the statute it purports to effectuate, New Jersey Guild of Hearing Aid Dispensers, supra, 75 N.J. at 561, 384 A.2d 795, or if it alters the terms of the statute or frustrates the policy embodied in it. New Jersey State Chamber of Commerce v. New Jersey Elec. Law Enforcement Comm'n, 82 N.J. 57, 82, 411 A.2d 168 (1980). The party challenging the validity of a regulation bears the burden of establishing that it is arbitrary, capricious, or unreasonable. New Jersey State League of Municipalities, supra, 158 N.J. at 222, 729 A.2d 21.
We reject DEP's assertion that N.J.A.C. 7:7-1.4(b) is valid and that it does not have to review a permit application specifically applying the criteria set forth in N.J.S.A. 13:19-10. Our reading of the CZM Rules does not reveal that the specific findings required by the statute are satisfied by compliance with the CZM Rules.
N.J.S.A. 13:19-10 says in part as follows:
[The commissioner] shall issue a permit only if he finds that the proposal facility:
a. Conforms with all applicable air, water and radiation emission and effluent standards and all applicable water quality criteria and air quality standards.
b. Prevents air emissions and water effluents in excess of the existing dilution, assimilative, and recovery capacities of the air and water environments at the site and within the surrounding region.
c. Provides for the collection and disposal of litter, recyclable material and solid waste in such a manner as to minimize adverse environmental effects and the threat to the public health, safety, and welfare.
d. Would result in minimal feasible impairment of the regenerative capacity of water aquifers or other ground or surface water supplies.

*222 e. Would cause minimal feasible interference with the natural functioning of plant, animal, fish, and human life processes at the site and within the surrounding region.
f. Is located or constructed so as to neither endanger human life or property nor otherwise impair the public health, safety, and welfare.
g. Would result in minimal practicable degradation of unique or irreplaceable land types, historical or archeological areas, and existing public scenic attributes at the site and within the surrounding region.
Ever since CAFRA was first enacted, our courts have required that DEP, even in light of the CZM Rules and DEP's broad power to regulate the coastal zone, specifically meet the criteria in N.J.S.A. 13:19-10 before issuing any CAFRA permit.
In Toms River Affiliates, supra, 140 N.J.Super. at 144, 355 A.2d 679, we explained the difference between general and specific standards that the Legislature sets forth to guide an agency. We stated that N.J.S.A. 13:19-10
sets forth specific criteria which must be met for the issuance of a permit for a proposed facility. N.J.S.A. 13:19-10. Many of these criteria may not be relevant to an application for a housing facility. Nevertheless, the standards outlined therein establish an adequately defined checklist for the guidance of the agency in granting or denying a permita checklist which has sufficient flexibility to carry out the purposes of the legislation in light of the rapidly changing conditions and body of scientific knowledge in the area of environmental protection.

[Toms River Affiliates, supra, 140 N.J.Super. at 144, 355 A.2d 679.]
After upholding the constitutionality of CAFRA, we affirmed DEP's denial of a CAFRA permit based on the statute's standards, stating: "In the context of the pattern of section 10 of the act (N.J.S.A. 13:19-10), a permit can be granted only if there is compliance with all of the criteria set forth in paragraphs (a) to (g)." Id. at 150, 355 A.2d 679.
In Pub. Interest Research Group of New Jersey, Inc. v. State, Dep't of Envtl. Prot., 152 N.J.Super. 191, 210-11, 377 A.2d 915 (App.Div.), certif. denied, 75 N.J. 538, 384 A.2d 517 (1977), we had to decide whether DEP erred by granting a permit on conditions to be met thereafter by the applicant. We refused to go so far as to say that the statutory mandate requires absolute compliance with all the requirements of N.J.S.A. 13:19-10 prior to the issuance of a permit together with definitive findings by the Commissioner as a condition precedent thereto. Instead, the court agreed that Section 10 was an adequately defined checklist for the guidance of the agency. Id. at 211, 377 A.2d 915.
In Crema v. New Jersey Dep't of Envtl. Prot., 182 N.J.Super. 445, 453, 442 A.2d 630 (App.Div.1982), aff'd as mod., 94 N.J. 286, 463 A.2d 910 (1983), we observed that "N.J.S.A. 13:19-10 confines DEP's power to issue a permit to cases where enumerated, specific findings are made regarding the development's impact on the environment."
In In re Egg Harbor Assocs. (Bayshore Centre), supra, 94 N.J. at 373, 464 A.2d 1115 (1983), the Court stated that "N.J.S.A. 13:19-10 lists specific findings that the agency must make in its determination to issue a permit."
In SMB Assocs. v. New Jersey Dep't of Envtl. Prot., 264 N.J.Super. 38, 41, 624 A.2d 14 (App.Div.1993), aff'd, 137 N.J. 58, 644 A.2d 558 (1994), the court noted that "[t]he Commissioner ... may not issue a permit unless he finds that the statutory *223 standards have been met." Accord In re Cape May County Mun. Utils. Auth., 242 N.J.Super. 509, 514-15, 577 A.2d 840 (App. Div.1990).
Thus, based on this long history of precedent and the plain language of the statute, we conclude that DEP must make findings under the standards in N.J.S.A. 13:19-10, even if DEP finds that a CAFRA permit application complies with its specific regulations.
N.J.A.C. 7:7-1.4(b) is invalid in so far as it permits DEP to issue a CAFRA permit without making the findings set forth in N.J.S.A. 13:19-10. Therefore, DEP shall amend the regulation to set forth a requirement that it make the statutory findings prior to issuing a permit.
B. SECTOR PERMIT PROGRAM
1. Introduction
Environmental appellants challenge the Sector Permit Program, N.J.A.C. 7:7-9.1 to -9.11, arguing that it: (1) is ultra vires because it allows an invalid subdelegation of DEP's authority to local governments; (2) fails to comply with the requirement that the statutorily-mandated factual findings in N.J.S.A. 13:19-10 be made prior to the issuance of any CAFRA permit; (3) fails to provide permit-issuing guidance to municipalities; and (4) fails to give DEP oversight powers for reviewing the merits of a municipality's decision and for safeguarding against arbitrary action.
To address the claims with respect to the sector permit program we repeat briefly some background noted earlier in this opinion. In August 1999, as part of its overall update of the CPP Rules at N.J.A.C. 7:7, DEP adopted the Sector Permit Program at N.J.A.C. 7:7-9.1 to -9.11. 31 N.J.R. 2042-124 (August 2, 1999) (proposal); 32 N.J.R. 503-95 (February 7, 2000)(adoption). DEP's goals for adopting this program were to: "(1) establish a more timely and predictable regulatory process; (2) ensure that plans and regulations are compatible between local, regional and State agencies; (3) ensure that planning precedes and guides regulatory activities; and (4) eliminate duplication in planning and regulatory activities." 31 N.J.R. 2046.
After creating the Sector Permit, DEP made various amendments to that program. 32 N.J.R. 352-63 (February 7, 2000) (proposal); 33 N.J.R. 843-69 (March 5, 2001) (adoption). These amendments expanded the scope of the program to all CAFRA-development within an entire "sector permit municipality" and updated the certification and recertification process for qualifying municipalities. Pursuant to the time of decision rule, Walker v. New Jersey Dep't of Insts. & Agencies, 147 N.J.Super. 485, 489, 371 A.2d 739 (App. Div.1977), we address the current version of the regulations.
2. Sector Permit Municipality
Under the Sector Permit Program, a municipality requests to be certified by DEP as a "sector permit municipality" so that any proposed individual development subject to CAFRA within its boundaries is thereafter subject to simultaneous, streamlined local and DEP review. 33 N.J.R. 843.
To be certified as a "sector permit municipality," a municipality must: (1) have somewhere within its boundaries a CAFRA center, CAFRA node, or a specific CAFRA core in a Coastal Metropolitan Planning Area or a Coastal Suburban Planning Area, and (2) demonstrate to DEP that its municipal land use ordinances will provide at least the same level of protection to coastal resources as is afforded by DEP's own regulations. 31 *224 N.J.R. 2043; N.J.A.C. 7:7-9.1 to -9.2. Municipalities with a Coastal Center are not eligible.
In addition, the municipality must also, among other things: (1) sign a memorandum of agreement setting forth its responsibilities; (2) adhere to specific reporting requirements; (3) notify DEP of any proposed changes in its land use ordinances; and (4) ensure that its land use ordinances remain consistent with changes in the CZM Rules. N.J.A.C. 7:7-9.4 to -9.5 and -9.11. DEP may suspend or revoke a sector permit municipality's certification for noncompliance. N.J.A.C. 7:7-9.6.
In March 2001, DEP reported that it was "currently working with 11 municipalities to assist them in preparing applications for certification as a sector permit municipality." 33 N.J.R. 846. To date, no municipality has been certified as a sector permit municipality.
3. Sector Permit Procedure
Pursuant to the Sector Permit Program, "a CAFRA-regulated development shall be authorized through the municipal approval process, subject to concurrent [DEP] review and oversight, if the development meets the requirements of N.J.A.C. 7:7-9.3 and if the applicant seeking authorization for the development fulfills the notice requirements at N.J.A.C. 7:7-9.7." N.J.A.C. 7:7-9.1(c) (purpose and scope). In other words, the sector permit municipality authorizes the development in lieu of a separate DEP CAFRA permit, while DEP concurrently reviews and oversees the process. DEP has described the procedure as follows:
Under the sector permit, the municipal government does not conduct a "CAFRA review." It reviews a CAFRA-regulated development application for consistency with its land use ordinances, which, in accordance with N.J.A.C. 7:7-9.4, must regulate the development to the same extent it would be regulated under CAFRA and the rules. Also, the Department will concurrently review each CAFRA application to ensure that it meets the requirements of the sector permit.

[33 N.J.R. 846.]
According to the regulations, the applicant that proposes CAFRA development in a sector permit municipality must provide the following notices to DEP's Land Use Regulation Program: (1) notice that an application has been filed and deemed complete by the local planning board; (2) notice that the local planning board has set a hearing on the development application; and (3) notice that the local planning board has adopted a memorializing resolution. N.J.A.C. 7:7-9.7(a)(1) to (a)(3).
Thereafter, N.J.A.C. 7:7-9.7(a)(4) sets forth DEP's role:
If the Department determines that the Sector Permit under this section is not applicable and that a CAFRA individual permit, general permit, permit-by-rule, or other coastal permit is instead required, the Department shall within 45 days of its receipt under (a)(3) above of notice of preliminary and final Planning Board approval, so notify the applicant and Planning Board.
Further, N.J.A.C. 7:7-9.8 states that DEP "shall publish notice in the DEP Bulletin of its decision ... that the Sector Permit is applicable or inapplicable."
In cases when the municipality itself proposes CAFRA development that does not require planning board approval, N.J.A.C. 7:7-9.7(b), the regulations require that the municipality must provide notice to DEP's Land Use Regulation Program ninety days before bid solicitation that the development is under consideration by the municipal governing body. N.J.A.C. 7:7-9.7(b)(1). *225 Thereafter, N.J.A.C. 7:7-9.7(a)(4) and (b)(2) set forth DEP's role:
4. If the Department intends to comment for the purpose of suggesting modifications to the development plan(s), it shall provide the municipal governing body with written comments ... [that] may include suggestions regarding how the development should be modified in order to meet the requirements of the Sector Permit and any additional conditions imposed in the [municipality's] certification letter....
2. If the Department determines that the Sector Permit under this section is not applicable and that a CAFRA individual permit, general permit, permit-by-rule, or other coastal permit is instead required, the Department shall within 45 days of its receipt under (a)(3) above of notice of preliminary and final Planning Board approval, so notify the applicant and Planning Board.
Again, N.J.A.C. 7:7-9.8 requires that DEP "shall publish notice in the DEP Bulletin of its decision ... that the Sector Permit is applicable or inapplicable."
Within ten days after publication of DEP's decision pursuant to N.J.A.C. 7:7-9.8, "any interested person who considers himself or herself aggrieved" by DEP's decision under N.J.A.C. 7:7-9.7 may file a written request for an adjudicatory hearing. N.J.A.C. 7:7-9.9(a).
4. Standards for Issuing a Sector Permit
N.J.A.C. 7:7-9.3 sets forth the sector permit standards as follows:
(a) The construction of CAFRA-regulated development, excluding structural shore protection as described at N.J.A.C. 7:7E-7.11(e), shall be authorized under the Sector Permit if the following requirements are met:
1. The development is located within the identified sector of a certified Sector Permit municipality;
2. The development is either:
I. Approved in accordance with the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq., by the planning board of the municipality without a variance or waiver from a provision(s) of the municipality's land use ordinances unless the planning board obtained prior written concurrence with such variance or waiver from the Department. The Department shall concur if the waiver or variance complies with the Coastal Zone Management rules, N.J.A.C. 7:7E, and if, notwithstanding the waiver or variance, the developments within the Sector shall continue to comply individually and collectively with the Coastal Zone Management rules; or
ii. Undertaken by the municipality and approved by the governing body of the municipality. The governing body shall obtain prior written concurrence from the Department if the approved development deviates in any way from the municipality's land use ordinances. The Department shall concur if the deviation complies with the Coastal Zone Management rules, N.J.A.C. 7:7E, and if, notwithstanding the deviation, the developments within the sector continue to comply individually and collectively with the Coastal Zone Management rules; and
3. Construction, including site preparation, of a development authorized under the Sector Permit shall not be started until either 45 days after receipt by the Department of the final planning board approval under N.J.A.C. 7:7-9.7(a)3 or 90 days after receipt by the Department of notice under N.J.A.C. 7:7-9.7(b)1, whichever is applicable, unless *226 prior to that time the Department publishes a notice in the DEP Bulletin pursuant to N.J.A.C. 7:7-9.8 that the Sector Permit is applicable to the development, in which case, construction may be started on or after the date of publication of such notice.
(b) For any CAFRA-regulated development within the sector of a certified Sector Permit municipality that does not meet the conditions for approval under the Sector Permit, the applicant shall, pursuant to the applicable requirements of this chapter, either, obtain from the Department a CAFRA individual permit or meet the requirements for authorization under a general permit or permit-by-rule.
Appellants contend that the Sector Permit Program is ultra vires because DEP improperly subdelegated its CAFRA permitting authority to the municipalities it certifies as sector permit municipalities. Appellants claim that the statutory language of CAFRA does not authorize, expressly or by implication, subdelegation.
For support, appellants rely on Mutschler v. New Jersey Dep't of Envtl. Prot., 337 N.J.Super. 1, 766 A.2d 285 (App.Div.), certif. denied, 168 N.J. 292, 773 A.2d 1156 (2001), as dispositive of the proposition that DEP cannot subdelegate its CAFRA power. In Mutschler, we held that "CAFRA contains no such legislative authorization for the DEP to subdelegate its regulatory authority to a municipality. In fact, CAFRA reflects a legislative determination that `municipal land use control [is] inadequate to assure orderly and environmentally-sound development' in the coastal area." Id. at 13, 766 A.2d 285 (quoting In re Egg Harbor Assocs., supra, 94 N.J. at 368, 464 A.2d 1115).
We agree that CAFRA does not authorize DEP to subdelegate its power, but conclude that the sector permit program does not constitute subdelegation. Instead, the process includes a comprehensive DEP review of municipal ordinances before a sector permit municipality certification is granted, and the process provides that DEP shall review development applications within a sector at the same time as they are reviewed by the local authorities. Furthermore, pursuant to N.J.A.C. 7:7-9.7(b), DEP can disapprove a sector permit and, pursuant to N.J.A.C. 7:7-9.8, it must publish notice of its decision that the sector permit "is applicable or inapplicable."
Accordingly, we are satisfied that DEP has not subdelegated any of its permit power to the municipalities, as N.J.A.C. 7:7-9.8 requires the agency to make and publish a final decision on applicability of the sector permit to the development.
We now address appellants' remaining claims with respect to the Sector Permit Program. Appellants first claim that DEP erred by failing to require sector permit municipalities to make any findings, including those legislatively mandated in N.J.S.A. 13:19-10, before issuing a CAFRA permit. Appellants argue that since the Legislature burdened DEP with the task of issuing permits only after making certain factual findings, DEP should have required the certified municipalities to make those same findings.
Appellants next claim that DEP erred by failing to provide to sector permit municipalities any specific guidance on making the decision of whether to approve a CAFRA-regulated development. They argue that the criteria in N.J.A.C. 7:7-9.3 are simply not sufficient to direct complex decisions about the potential effects of proposed development on coastal resources that are of regional importance.
Finally, appellants claim that DEP has failed to provide adequate procedural *227 safeguards in the Sector Permit Program to guarantee that municipalities exercising sector permit power are acting consistently with the requirements of CAFRA. They object to DEP's role in simply making a determination as to whether the sector permit is "applicable" or "not applicable."
We reject appellants' claims. N.J.S.A. 13:19-10 governs DEP's actions and, short of improper subdelegation, DEP cannot require a municipality to make the decisions pursuant to that statute. The statute applies to the DEP, not a municipality. Indeed, most municipalities lack the technical expertise to make such findings.
Furthermore, we conclude that the standards set forth in N.J.A.C. 7:7-9.3 for sector permit municipalities to use when granting a sector permit are adequate to inform those municipalities of their duties. According to those standards, a sector permit municipality can approve an application if it is consistent with its local ordinances, which have been vetted by DEP in conjunction with the CZM Rules as part of being certified as a sector permit municipality.
Moreover, contrary to appellants' argument, DEP has provided adequate procedural safeguards. The procedure provides that DEP is the ultimate decision-maker on a sector permit, and a hearing may be conducted after that decision. N.J.A.C. 7:7-9.8 states that DEP "shall publish notice in the DEP Bulletin of its decision ... that the Sector Permit is applicable or inapplicable," and N.J.A.C. 7:7-9.9 gives "any interested person who considers himself or herself aggrieved" the right to file a written request for an adjudicatory hearing.
Thus, contrary to appellants' specific claims, DEP has not relinquished its oversight power. In fact, in response to comments, DEP stated:
The Department does not relinquish its permitting authority when it certifies a municipality to approve CAFRA-regulated development within the boundaries of its sector. Rather, the sector permit facilitates a coordinated coastal protection planning effort between the State and the municipality that is reflected and incorporated in the municipality's local land use ordinances. The sector permit requires that, in order for the municipality to be certified to issue approvals under the sector permit, its ordinances must be demonstrated to be as protective as the standards in the Coastal Zone Management rules that the Department applies in reviewing CAFRA applications outside sector permit municipalities. With the CAFRA standards embodied in the certified sector permit municipality's local ordinances, an application for development in the sector can be reviewed and approved through the local planning board without a separate approval process through the Department. The sector permit provides, however, that the Department must be notified of each development application so that it can comment on the application and make sure that the application is approvable under the sector permit.
The Department retains the authority to require an individual CAFRA permit application or to determine that the sector permit is inapplicable on a case-by-case basis. In addition, safeguards are built into the sector permit to ensure that the local approvals meet statutory and regulatory CAFRA requirements. In addition to the requirement at N.J.A.C. 7:7-9.4(e)2 and 3 that a sector permit municipality's land use ordinances be as protective as CAFRA standards, N.J.A.C. 7:7-9.5(a) requires a *228 certified sector permit municipality to obtain Department review and approval of proposed changes in ordinances. N.J.A.C. 7:7-9.5(c) requires a sector permit municipality to provide an annual report on all variances or deviations from the provisions of municipal land use ordinances so that the Department can ensure that the ordinances it has reviewed and deemed compatible and consistent with CAFRA are applied. Finally, N.J.A.C. 7:7-9.6 provides that noncompliance by a municipality can result in a suspension of the sector permit process in that municipality. Thus the Department's oversight role in the sector permit process ensures that the CAFRA standards will be properly implemented in sector permit municipalities.

[33 N.J.R. 847.]
DEP further responded to public comments with the following:
The Sector Permit is intended to provide a mechanism for streamlined CAFRA permit review, not to alter the Department's regulatory jurisdiction or substantive standards used to make permit decisions. The Sector Permit process is not mandatory, but rather is an option available to coastal municipalities seeking to facilitate and streamline the approval of CAFRA-regulated development in those communities.

[32 N.J.R. 521 (February 7, 2000) (emphasis added).]
Nevertheless, under the sector program, the CAFRA portion of the application review must be conducted by DEP and the permit must be authorized by DEP applying, in addition to any other requirements, N.J.S.A. 13:19-10 and making the necessary findings required by that statutory provision. As we directed in our earlier discussion of DEP's responsibility under N.J.S.A. 13:19-10, it shall amend its regulations to set forth clearly its obligation to comply with the statute before the sector permit is issued.
The Environmental appellants, in Appeal No. A-4250-00, also contend that DEP improperly subdelegated its control of CAFRA development by giving certified sector permit municipalities their own waiver power and the power to grant permits for development by municipalities.
As to waivers, appellants assert that N.J.A.C. 7:7-9.5(c) improperly allows sector permit municipalities to make widespread exceptions and waivers to the requirements of the CAFRA rules by issuing municipal approvals with variances and deviations using the less stringent waiver provision in the Municipal Land Use Law ("MLUL"), N.J.S.A. 40:55D-1 to -136, instead of requiring all waivers of the permit requirements to be evaluated under CAFRA's stricter waiver provision in N.J.A.C. 7:7-1.10, which compels a permit applicant to demonstrate "an extraordinary hardship" before DEP "may relax the application of the standards in N.J.A.C. 7:7E."
Although the Sector Permit Program does not require its certified municipalities to follow the waiver provision in the CAFRA regulations, DEP must concur prior to the municipality's granting a waiver or variance, and DEP can concur only if the development continues to comply with the CAFRA regulations, which include the waiver provision in N.J.A.C. 7:7-1.10.
Contrary to appellants' assertion, N.J.A.C. 7:7-9.5(c) merely lists the responsibilities of a certified sector permit municipality and does not govern the standards for granting variances and waivers under the Sector Permit Program. N.J.A.C. 7:7-9.5(c) states:
The municipality shall provide a report to [DEP] by January 31 of each year, identifying the variances granted *229 under the [MLUL] and the deviations from the municipality's land use ordinances for developments undertaken by the municipality in the immediately preceding year. The annual report shall include only variances and deviations from the land use ordinances identified in the certification letter issued to the municipality under N.J.A.C. 7:7-9.4(h). The report shall exclude variances granted to individual single family or duplex developments which are not part of a larger development. The report shall include the following:
1. A list, by lot and block, of such variances and deviations;
2. A narrative description of the basis for each such variance and deviation; and
3. An analysis demonstrating how the municipality continues to comply with the terms of its certification as a Sector Permit municipality despite such variances and deviations.
The actual standards used by sector permit municipalities when granting a sector permit with or without waivers or variances from the local ordinances are set forth in N.J.A.C. 7:7-9.3, which states in pertinent part:
(a) The construction of CAFRA-regulated development, excluding structural shore protection as described at N.J.A.C. 7:7E-7.11(e), shall be authorized under the Sector Permit if the following requirements are met:
1. The development is located within the identified sector of a certified Sector Permit municipality;
2. The development is either:
I. Approved in accordance with the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq., by the planning board of the municipality without a variance or waiver from a provision(s) of the municipality's land use ordinances unless the planning board obtained prior written concurrence with such variance or waiver from the Department. The Department shall concur if the waiver or variance complies with the Coastal Zone Management rules, N.J.A.C. 7:7E, and if, notwithstanding the waiver or variance, the developments within the Sector shall continue to comply individually and collectively with the Coastal Zone Management rules; ....
... and
3. Construction, including site preparation, of a development authorized under the Sector Permit shall not be started until either 45 days after receipt by the Department of the final planning board approval under N.J.A.C. 7:7-9.7(a)3 or 90 days after receipt by the Department of notice under N.J.A.C. 7:7-9.7(b)1, whichever is applicable, unless prior to that time the Department publishes a notice in the DEP Bulletin pursuant to N.J.A.C. 7:7-9.8 that the Sector Permit is applicable to the development, in which case, construction may be started on or after the date of publication of such notice.
(b) For any CAFRA-regulated development within the sector of a certified Sector Permit municipality that does not meet the conditions for approval under the Sector Permit, the applicant shall, pursuant to the applicable requirements of this chapter, either, obtain from the Department a CAFRA individual permit or meet the requirements for authorization under a general permit or permit-by-rule.

[Emphasis added.]
According to these standards, even if a sector permit municipality grants a variance or waiver from its own municipal *230 ordinances, DEP is still required, "notwithstanding the waiver or variance," to ensure that the developments "continue to comply individually and collectively with the Coastal Zone Management rules," which include the waiver requirements in N.J.A.C. 7:7-1.10. In fact, we note that N.J.A.C. 7:7-1.10 is mandatory; it states, in part:
(c) In making any permit decision under this chapter, the Department may relax the application of one or more of the substantive standards in the rules on Coastal Zone Management at N.J.A.C. 7:7E. The Department may relax the application of the standards in N.J.A.C. 7:7E only if the applicant demonstrates that an extraordinary hardship exists. [The definition of "an extraordinary hardship" follows.]
....
(d) An applicant may request a relaxation of a substantive standard(s) in N.J.A.C. 7:7E under (c) above either:
1. At the same time that the applicant submits a permit application. However, the Department will not make a decision on the request until after the Department renders a decision on the permit application; or
2. After receiving notice of a Department decision on a permit application....

[Emphasis added.]
Hence, we reject appellants' claim that N.J.A.C. 7:7-9.5(c) improperly allows sector permit municipalities to use the MLUL to grant variances and waivers from their own ordinances.
Appellants next argue that the Sector Permit Program improperly allows a sector permit municipality to issue to its own developments a sector permit under N.J.A.C. 7:7-9.3(a)(2)(ii) and N.J.A.C. 7:7-9.4(e), without DEP review and without being required to hold a public hearing. We disagree.
The Sector Permit Program allows its certified municipalities to approve sector permits for development undertaken by the municipality. Indeed, that power is granted by N.J.A.C. 7:7-9.3, which states in pertinent part:
(a) The construction of CAFRA-regulated development, excluding structural shore protection as described at N.J.A.C. 7:7E-7.11(e), shall be authorized under the Sector Permit if the following requirements are met:
....
2. The development is....
....
ii. Undertaken by the municipality and approved by the governing body of the municipality. The governing body shall obtain prior written concurrence from the Department if the approved development deviates in any way from the municipality's land use ordinances. The Department shall concur if the deviation complies with the Coastal Zone Management rules, N.J.A.C. 7:7E, and if, notwithstanding the deviation, the developments within the sector continue to comply individually and collectively with the Coastal Zone Management rules; and
3. Construction, including site preparation, of a development authorized under the Sector Permit shall not be started until either 45 days after receipt by the Department of the final planning board approval under N.J.A.C. 7:7-9.7(a)3 or 90 days after receipt by the Department of notice under N.J.A.C. 7:7-9.7(b)1, whichever is applicable, unless prior to that time the Department publishes a notice in the DEP Bulletin pursuant to N.J.A.C. 7:7-9.8 that the Sector Permit is applicable to the development, in which case, construction may *231 be started on or after the date of publication of such notice.
(b) For any CAFRA-regulated development within the sector of a certified Sector Permit municipality that does not meet the conditions for approval under the Sector Permit, the applicant shall, pursuant to the applicable requirements of this chapter, either, obtain from the Department a CAFRA individual permit or meet the requirements for authorization under a general permit or permit-by-rule.
We are satisfied that DEP is the ultimate decision-maker on a sector permit issued for development by the municipality. Contrary to appellant's assertion, N.J.A.C. 7:7-9.4(e) merely lists the requirements for certification as a sector permit municipality:
(e) Upon completion of its review of the information submitted by the municipality in its request for certification and the comments received on the request, the Department shall determine if the following conditions for certification as a sector permit municipality are met:
1. Any development that would be constructed in accordance with the municipality's land use ordinances in the CAFRA area of the municipality, both within and outside of the Sector, would comply with the Coastal Zone Management rules, N.J.A.C. 7:7E;
2. Any CAFRA-regulated development that would be constructed within the Sector and that requires approval by the planning board under the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq., would be evaluated and approved or denied through the municipal planning board approval process or, for development undertaken by the municipality, by the municipal governing body; and
3. Any development that is to be authorized under the Sector Permit and that is either subject to planning board approval under the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq., or undertaken by the municipality shall be regulated under the municipality's land use ordinances to the same extent as it would be regulated under CAFRA and this chapter. For example, although municipal ordinances often do not consider all building elements such as decks and gazebos as "structures" subject to municipal planning board review, for purposes of certification as a sector permit municipality, a municipality's land use ordinances must provide standards for such building elements.
As noted, DEP is the final decision-maker of a sector permit. The notice requirements inform our judgment. In fact, "a CAFRA-regulated development shall be authorized through the municipal approval process, subject to concurrent [DEP] review and oversight, if the development meets the requirements of N.J.A.C. 7:7-9.3 and if the applicant seeking authorization for the development fulfills the notice requirements at N.J.A.C. 7:7-9.7." N.J.A.C. 7:7-9.1(c).
In cases where the municipality itself proposes CAFRA development, the regulations require that the municipality must provide the following notice to DEP's Land Use Regulation Program: notice ninety days before bid solicitation that the development is under consideration by the municipal governing body. N.J.A.C. 7:7-9.7(b)(1). Thereafter, N.J.A.C. 7:7-9.7(a)4 and (b)2 set forth DEP's role:
(a)4. If the Department determines that the Sector Permit under this section is not applicable and that a CAFRA individual permit, general permit, permit-by-rule, or other coastal permit is instead required, the Department shall *232 within 45 days of its receipt under (a)(3) above of notice of preliminary and final Planning Board approval, so notify the applicant and Planning Board.
(b)2. If the Department intends to comment for the purpose of suggesting modifications to the development plan(s), it shall provide the municipal governing body with written comments ... [that] may include suggestions regarding how the development should be modified in order to meet the requirements of the Sector Permit and any additional conditions imposed in the [municipality's] certification letter....
N.J.A.C. 7:7-9.8 requires that DEP "shall publish notice in the DEP Bulletin of its decision ... that the Sector Permit is applicable or inapplicable."
According to those standards, DEP is required to make and then publish its decision on whether the sector permit is applicable or inapplicable. Furthermore, within ten days after publication of DEP's decision pursuant to N.J.A.C. 7:7-9.8, "any interested person who considers himself or herself aggrieved" by DEP's decision under N.J.A.C. 7:7-9.7 may file a written request for an adjudicatory hearing. N.J.A.C. 7:7-9.9. Thus, contrary to appellants' claim, a hearing may be conducted by DEP.
Hence, we disagree with appellants' claim that there is an impropriety in allowing sector permit municipalities to issue a sector permit to their own municipal developments. We reiterate, however, that DEP must follow N.J.S.A. 13:19-10 and make the requisite findings before the sector permit is issued.
C. IMPERVIOUS COVER REGULATIONS
1. Definition Not Arbitrary
Appellants object to the impervious cover regulations, arguing: (1) the definition of impervious cover in N.J.A.C. 7:7E-1.5(c) is arbitrary; (2) the percentages were not supported by any scientific data or other evidence in the record; (3) the numeric percentages selected by DEP are not closely coordinated with the State Plan; and (4) DEP violated the APA by not revealing the evidence to support the impervious cover regulations to the public even when requested to do so by appellants. We are not persuaded by appellants' claims and reject them. We therefore affirm the impervious cover regulations.
Appellants argue that DEP's definition of impervious cover in N.J.A.C. 7:7E-1.5(c) is arbitrary and not supported by the record. They claim that DEP has historically always made a distinction between impervious cover or nonporous materials and permeable cover such as porous paving blocks, paver blocks, gravel, crushed stone and shells, and elevated structures like boardwalks or decks. Appellants point out that under the former regulations, the use of permeable paving rather than impervious cover increased the acceptable development intensity of a site by two to ten percent, N.J.A.C. 7:7E-5.6 (deleted 2000). Appellants declare that DEP now makes no distinction in N.J.A.C. 7:7E-1.5 between impervious and permeable cover, and claim that DEP has arbitrarily done this merely as a matter of its own administrative convenience without any basis, scientific or otherwise, to support its expansion of the definition of "impervious cover."
N.J.A.C. 7:7E-1.5(c) states:
"Impervious cover" means any structure, surface, or improvement that reduces and/or prevents absorption of stormwater into land. Porous paving, paver blocks, gravel, crushed stone, crushed shell, elevated structures (including *233 boardwalks), and other similar structures, surfaces, or improvements are considered impervious cover. Grass, lawns, or any other vegetation are not considered impervious cover.
In our view, this definition of impervious cover is not arbitrary and is not a departure from the prior development intensity rules. In August 1996, DEP amended the definition of "acceptable intensity of development" in N.J.A.C. 7:7E-5.6(a) to mean not only "structures," but also "paving," which was defined to include both impervious paving and permeable surfaces such as gravel or paver blocks. 28 N.J.R. 3924-34 (August 19, 1996) (adoption); 28 N.J.R. 324-30 (February 5, 1996) (proposal). At that time, the impervious cover limits were changed from the range of thirty to forty percent, based on whether or not permeable surfaces were used, to a single standard of forty percent.
Moreover, according to DEP, the August 1996 change was the result of its extensive experience with permeable paving from August 1980 to August 1996. DEP explained that "frequently materials considered `porous' when applied during the initial development were replaced with impervious pavement at a later date. Additionally, more permeable materials used as a surface cover are often not properly maintained thus becoming more impervious over time." 32 N.J.R. 524. For example, DEP found that "permeable surfaces such as gravel or crushed shell become increasingly compact over time such that absorption of storm water by the underlying soils is greatly reduced and/or prevented." Ibid. Accordingly, DEP told commenters that its intent in adopting the current definition of impervious cover was "to limit the use of structures and covers that not only restrict storm water absorption by the underlying soils, but also reduce this absorption." Ibid. Thus, we affirm the regulation defining impervious cover and reject appellants' claim that the definition is arbitrary or unsupported by the record.
2. Adequacy of Numeric Limitations on Impervious Cover
Appellants challenge the numeric limitations on impervious cover, arguing that there is no scientific data or other evidence presented in the record to support the percentages selected by DEP. We disagree.
Appellants acknowledge that DEP did reference studies indicating that an increase of impervious cover on a regional basis generally results in environmental degradation. Nonetheless, appellants point out that: (1) these studies were not commissioned by DEP; (2) there is no indication that they are specific to New Jersey; and (3) they do not support the particular numeric limitations or policies chosen by DEP. Appellants argue that DEP's justification is flawed, because, as they note, some lesser impervious cover percentage would always achieve greater environmental protection.
Appellants further state that the deficiency in the record of a scientific basis is exemplified by DEP's changes to the proposed limits between its 1998 and 1999 rule proposals. By way of example, appellants correctly note that between the initial proposal in 1997 and the final rule adoption in 2000, the impervious cover percentages for the Coastal Metropolitan Planning Area increased from fifty to eighty percent, for the Coastal Rural Planning Area increased from one to three percent, and for the Coastal Environmentally Sensitive Planning Area increased from three-tenths to three percent. Appellants assert that DEP changed its limits without any scientific basis, merely relying on the general principle that the percentage of impervious *234 cover at a site is tied to environmental degradation, see 31 N.J.R. 2061-63, and that DEP historically used impervious cover limits as a means of environmental protection. 32 N.J.R. 546-47.
For additional support, appellants point to New Jersey Chapter of the Nat'l Ass'n of Indus. & Office Parks (NAIOP) v. New Jersey Dep't of Envtl. Prot., 241 N.J.Super. 145, 574 A.2d 514 (App.Div.), certif. denied, 122 N.J. 374, 585 A.2d 379, 380 (1990). There, we invalidated a freshwater wetlands regulation setting fixed acreage ratios for wetlands mitigation, because even though DEP presented a general justification for its ratio in comments to the proposed rule, it failed to provide any scientific justification for its use of a 7:1 ratio rather than some lesser or greater ratio. Id. at 163, 574 A.2d 514. We called the ratio "no more than a regulatory guess." Ibid. Consequently, we declared that "[w]hile we must defer to the agency's expertise, we need not surrender to it." Id. at 165, 574 A.2d 514.
In contrast, appellants point to Bergen Pines Cty. Hosp. v. New Jersey Dep't of Human Servs., 96 N.J. 456, 477-78, 476 A.2d 784 (1984), in which the Court found a rational basis for regulations when the agency had prepared and presented in the record a special study to support the regulations. Analogizing that case to the facts here, appellants note that DEP did not conduct any specific studies designed to analyze and support its impervious cover limitations, but simply relied on general assertions of environmental protection to support its conclusion that the proposed impervious cover limits will have a positive environmental impact because that cover on developed sites is directly linked to environmental degradation.
In its responses to commenters regarding the apparent lack of justification for the percentages adopted, DEP explained:
The impervious cover limits established in the rule will enable the Department to achieve a number of longstanding policy objectives in the CAFRA area, including protection of environmentally sensitive areas, agricultural lands and open space, more efficient use of infrastructure, concentration of development, and protection of water and air sheds. Further, the coverage limits will enable the Department to meet its responsibility to closely coordinate the CAFRA rules with the State Development and Redevelopment Plan, as set forth in the 1993 legislative amendments to CAFRA. The Department used the State Plan Resource Planning and Management Map as a basis for the CAFRA Planning Map that identified the various Coastal Planning Areas. The Department based the allowable impervious cover limits for each Coastal Planning Area on the attributes of those areas.
The Department has historically used impervious cover as a way to ensure that CAFRA regulated development in the coastal zone is protective of natural resources and the health and welfare of our citizens. The prior coverages ranged from three percent to 90 percent, which is the same range established in this rule. The adopted rule will continue this practice, but will apply impervious cover limits in clearly delineated areas. This will facilitate planning and design decisions for developers, streamline the permit process for the Department, limit development in those areas that are the most environmentally sensitive and fragile and encourage development of compatible land uses within a comprehensive environmental design strategy. In developing this impervious cover approach, the Department reviewed many studies, including "Impervious Surface Coverage: *235 The Emergence of a Key Environmental Indicator" (Arnold C. Gibbons, 1996, Journal of the American Planning Association) and "The Importance of Imperviousness " (T.R. Schuler, 1994, Watershed Protection Techniques). These studies conclude that as impervious cover increases, degradation of surface and ground water resources increases. While the studies reviewed describe impervious cover impacts on a regional or watershed-wide basis, the Department's use of impervious cover limits on a site by site basis within a designated area, when considered collectively, will result in regional protections. The Department believes that the impervious cover limits in Table H represent a reasonable approach to fulfilling its obligation to closely coordinate these rules with the State Plan (as required in the 1993 amendments to CAFRA) and to protect the State's coastal resources from inappropriate development, to steer development into appropriate areas, and to promote air and water quality in the coastal zone. In addition, the water quality and air quality resource rules at N.J.A.C. 7:7E-8.4 and 8.10, respectively, will continue to protect water quality and air quality.

[32 N.J.R. 546-47.]
We are not persuaded by appellants' arguments, because we conclude that DEP has demonstrated that there was ample evidence in the record to support its choices. In addition to its own historical experience using cover percentages, we note that DEP proposed various versions of the current regulations while extending comment periods and holding a myriad of meetings with the building community, environmental groups, county planning offices, and municipalities in the affected areas. In fact, the effect of this participation can be seen in the changes that DEP made between its proposals. For example, as to those changes, DEP explained:
The Department determined that the increase from 50 percent to 80 percent in the Coastal Metropolitan Planning Area better recognized existing development levels and would serve to encourage development in these areas pursuant to the Department's goal of concentrating development in already developed areas. The five percent impervious cover limit for areas outside of sewer service areas in the Coastal Suburban Planning Area has been established to reflect the lack of sewer in parts of the planning area, and the planning and public input inherent in adopting a water quality management plan calling for sewering an area. If an area is identified as acceptable for sewers, even in cases where they are not yet in place, the impervious cover limit would increase to 30 percent when the area is approved for sewer service. The lower impervious cover limits in the Coastal Rural and Environmentally Sensitive Planning Areas are intended to protect the agricultural and natural resources and open space in those areas, taking into consideration existing development and smaller development not subject to review under CAFRA. These lower limits are the same as the lowest limits applied under the prior rules in Subchapter 5 adopted in 1978.

[32 N.J.R. 548.]
Thus, we conclude that these were not the same circumstances presented in NAIOP v. New Jersey Dep't of Envtl. Prot., supra, because DEP consulted scientific studies, all facets of the public participated in the regulatory process, and DEP had the benefit of the State Plan's policies and planning principles. Furthermore, it is especially appropriate to give *236 deference to an agency when it is trying to put new and innovative legislation into practice. Newark Firemen's Mut. Benevolent Ass'n, Local No. 4, supra, 90 N.J. at 55, 447 A.2d 130.
3. Lack of Coordination With State Plan
Appellants next argue that there is no evidence in the record that the numeric percentages selected by DEP in N.J.A.C. 7:7E-5B.4 and -5B.5 are closely coordinated with the State Plan. Appellants claim that the State Plan has different goals than CAFRA, so any cover percentages that DEP selects based on the State Plan are arbitrary and will be based on different planning and development policies. Thus, they assert that there is no relationship between the impervious cover percentages in the regulations and the goals of CAFRA or the policies of the State Plan.
We agree with appellants' claim that the goals in CAFRA and the policies in the State Plan are different in language and scope. "A major goal of the State Plan is to halt suburban sprawl, characterized as a `pattern of development that destroys the character of the cultural landscape, is inefficient in terms of public facilities and services and devoid of the sense of place that has long defined the character of life in New Jersey.'" Mt. Olive Complex v. Tp. of Mt. Olive, 340 N.J.Super. 511, 541, 774 A.2d 704 (App.Div.2001). Consequently, the policies in the State Plan cover not just the coastal zone, but all aspects of quality of life, historic preservation and environmental protection and economic prosperity.
Nevertheless, the State Plan cites to and directly takes into account CAFRA and its goals. In fact, there is a large section on "Coastal Resources," in which the State Plan lists fifteen distinct policies for the coastal area: eleven separate planning policies; two policies for water resources; and two policies for historic, cultural and scenic resources.[10]
In our view, these policies are similar enough to the goals of CAFRA. The Legislature enacted CAFRA as an environmental protection statute "to protect the unique and fragile coastal zones of the State." In re Egg Harbor Assocs. (Bayshore Centre), supra, 94 N.J. at 364, 464 A.2d 1115. However, over the years, CAFRA has expanded its reach "well beyond protection of the natural environment," and now "the delegated powers require DEP to regulate land use within the coastal zone for the general welfare." Ibid. The policies of the State Plan were also developed for the general welfare.
Moreover, it is clear from the impervious cover percentages themselves in N.J.A.C. 7:7E-5B.4 that DEP is incorporating the goals of CAFRA and the expressed policies in the State Plan by adopting those limits to steer development into centers and promote open space preservation in their environs by using cover limitations that are highest in centers and lowest in the more fragile planning areas. Indeed, N.J.S.A. 13:19-2 requires "a comprehensive environmental design strategy which preserves the most ecologically sensitive and fragile area from inappropriate development and provides adequate environmental safeguards for the construction of any developments in the coastal area." Hence, we are satisfied that there is sufficient evidence in the record to support the percentages selected by DEP and that the *237 percentages are closely coordinated with the State Plan.
4. APA Violations
Appellants also argue that DEP violated the APA when it failed to honor their numerous individual requests to see the scientific information on which DEP based the impervious cover percentages in N.J.A.C. 7:7E-5B.4. Appellants assert, therefore, that DEP denied them a reasonable opportunity to submit data, views or arguments on the proposed percentages.
In fact, the Builders accuse DEP of meeting individually with other members of the public at the same time that it was telling the Builders in letters dated March 18, and September 24, 1999, that it would be "legally inappropriate for the department to respond on an ex parte or unilateral basis to inquiries and arguments concerning a proposed rule while that proposal is pending." The Builders point to the letter from DEP dated September 24, 1999, where DEP stated that "we have been addressing specific questions about our strategies and goals before and since publication as they have arisen via briefings, phone calls, or letters." In its September 24, 1999 letter to the Builders, DEP wrote:
As noted in our March 18, 1999 letter, the Department believes it is legally inappropriate to respond on an ex parte or unilateral basis to inquiries concerning a pending rule proposal. In keeping with the Administrative Procedure Act, we will answer all comments about provisions of the CAFRA rule proposal by accepting these comments and then responding upon adoption and publication in the New Jersey Register. In the meantime, we have been addressing specific questions about our strategies and goals before and since publications as they have arisen via briefings, phone calls, or letters.
We appreciate your intent to prepare informed comments on the proposal. If it will assist you, the Department's Office of State Plan Coordination maintains a reference library of some of the resources used in formulating the rule. This library is open to the public and may be of interest to you. We have enclosed a catalogue of contents so that you can decide if there are articles that you would like to review. We have also included a bibliography of other references currently not in the library about impervious cover limits.
The APA provides that prior to the adoption, amendment or repeal of any rule, an agency shall provide notice of "the terms or substance" of its intended action. N.J.S.A. 52:14B-4(a)(1). The purpose of this procedure is "to give those affected by the proposed rule an opportunity to participate in the rule-making process not just as a matter of fairness but also as `a means of informing regulators of possibly unanticipated dimensions of a contemplated rule.'" Federal Pac. Elec. Co. v. New Jersey Dep't of Envtl. Prot., 334 N.J.Super. 323, 340-41, 759 A.2d 851 (App.Div.2000) (quoting In re Adoption of Regulations Governing Volatile Organic Substances in Consumer Prods., N.J.A.C. 7:27-23, 239 N.J.Super. 407, 411, 571 A.2d 971 (App. Div.1990)).
In our view, DEP did not violate the APA. Simply put, it is clear from DEP's letter that the Builders could find the pertinent scientific studies and other data in DEP's Office of State Plan Coordination. Thus, we reject appellants' claim based on a violation of the APA.
D. OVERALL COORDINATION WITH STATE PLAN
1. Appellants' Contentions
All appellants contend that DEP's use of the centers and planning areas in the State *238 Plan and creation of its own coastal centers was arbitrary, capricious and unreasonable. The Builders essentially argue that DEP's regulations were not closely coordinated enough with the State Plan, while the Environmental appellants argue that DEP's regulations were too closely coordinated. The Realtors, however, argue that DEP failed to disclose the criteria and methodology that it was using, and they are joined by the Environmental appellants, who claim that there is no evidence in the record to support DEP's specific delineations. Further, Environmental appellants claim that N.J.A.C. 7:7E-5B.3, which governs DEP's standards for reviewing new or changed boundaries established by the State Planning Commission, violates the notice and comment requirements of the APA at N.J.S.A. 52:14B-4, and results in illegal rule-making.
2. Too Little Coordination With State Plan
We first discuss the matter of the regulations apparently having too little coordination with the State Plan. Appellants argue that DEP failed to coordinate all of the various policies and goals of the State Plan when it created its land categories. They claim that DEP further erred by establishing coastal centers along readily observable physical features that reflected only existing development, instead of using the State Plan's factors of population, growth projects and affordable housing. Appellants also contend that DEP ignored the State Plan's policies for distinguishing barrier islands and adopted boundaries coinciding with municipal boundaries. Moreover, appellants point to the fact that DEP can undercut the State Plan Policy Map by rejecting or modifying, pursuant to N.J.A.C. 7:7E-5B.3, any new boundaries set by the State Planning Commission.
We are not persuaded by appellants' arguments. N.J.S.A. 13:19-17(b) clearly does not require DEP to adopt all of the policies and goals of the State Planning Commission in order to closely coordinate its rules with the provisions of the State Plan. Furthermore, we do not conclude that DEP's use of coastal centers is arbitrary. It is clear from the large record that DEP delineated its interim coastal centers in communities where local officials had advised the State Planning Commission of their intent to obtain formal center designation, and that coastal centers were adopted by DEP as an interim measure, pending completion of that formal State Planning Commission process. Moreover, in delineating those coastal centers, DEP consulted with local planning officials to draw boundaries based on existing infrastructure and development and to accommodate imminent growth. If these centers had not been delineated, then the CAFRA rules would have been unable to accommodate imminent planned development. We therefore reject the claim that DEP erred in creating interim Coastal centers.
3. Too Much Coordination With State Plan
We now discuss some of appellants' claims that DEP's regulations were too coordinated with the State Plan. Appellants argue that DEP erred by giving "regulatory effect" to the State Plan by presuming in N.J.A.C. 7:7E-5B.3 that the boundaries established by the State Planning Commission will work as CAFRA boundaries and then by using those boundaries to establish the impervious cover limits in N.J.A.C. 7:7E-5B.4. In addition, appellants argue that the State Plan has different goals than CAFRA, so any percentages or boundaries that DEP selected based on the State Plan will be improperly based on policies not contemplated by *239 CAFRA. In essence, appellants object to the fact that DEP has relied on the State Planning Commission's policies and argues that the policies create a "presumption" of validity in DEP's regulations.
For support, appellants cite to Mt. Olive Complex, supra, 340 N.J.Super. at 543, 774 A.2d 704, in which we stated that "currently the State Plan has no regulatory effect," and to New Jersey Builders Ass'n v. New Jersey Dep't of Envtl. Prot., 306 N.J.Super. 93, 96-97, 703 A.2d 323 (App.Div.1997), in which we said that the State Plan has "no regulatory effect" and that it is "not appropriate to use the State Plan directly to formulate" regulations.
Initially, we note that the State Plan itself declares that it has no regulatory effect. The 2001 State Plan declares in its Preface the following:[11]
New Jersey's State Plan, including its State Plan Policy Map (Policy Map), is used to guide municipal, county and regional planning, state agency functional planning and infrastructure investment decisions. It is not appropriate to use the State Plan directly to formulate codes, ordinances, administrative rules or other regulations. Such regulations should be formulated to carry out the master and functional plans of the responsible agencies.
In the chapter entitled "Role of the State Development and Redevelopment Plan," the section on "How the State Plan Should Be Used" states:[12]
The State Plan is different from functional state agency plans and municipal and county master plans. The State Plan is not a regulation but a policy guide for state, regional and local agencies to use when they exercise their delegated authority. For example, the State Plan does not automatically change the criteria for the issuance of a state permit, but it does contemplate that the agency responsible for issuing permits should review its plans and regulations in light of the State Plan and make appropriate modifications to reflect the provisions of the Plan, if such modifications are within the scope of the agency's authority. If the necessary modifications would exceed the agency's authority, it should seek to obtain the authority through normal legislative or rule-making processes.
Despite the above, we disagree with appellants' assertion that DEP is not entitled to give any regulatory effect to the State Plan. First, despite the language in the State Plan, the Legislature in N.J.S.A. 13:19-17(b) clearly requires that DEP's regulations "shall be closely coordinated with the provisions of the State Development and Redevelopment Plan." Second, in New Jersey Builders Ass'n, supra, 306 N.J.Super. at 97, 703 A.2d 323, we found that the State Plan was "not a regulation but a policy guide for State, regional and local agencies to use when they exercise their delegated authority." Indeed, even though in Mt. Olive Complex, supra, we said that the State Plan had no regulatory effect at that time, we observed: "that is not to say that a municipality may not refer to the State Plan recommendations and guidelines in its legislative decision[s]." 340 N.J.Super. at 543-44, 774 A.2d 704. We concluded, in fact, that the Legislature had recently proposed strengthening the effect of the State Plan. Id. at 543, 774 A.2d 704. Moreover, in January 2002, the State Planning Commission deleted the following phrase from its regulations: "Neither the State Development and Redevelopment Plan nor its Resource *240 Planning Management Map is regulatory." N.J.A.C. 17:32-8.2(b) (amended 2002). Therefore, we conclude no invalidity occurred when DEP gave the State Plan effect in adopting its regulations.
Moreover, we do not conclude that DEP is giving the State Planning Commission's boundary actions a "presumption" of validity, because it is clear from the record that DEP reviewed and continues to review, pursuant to N.J.A.C. 7:7E-5B.3, the actions of the Planning Commission in terms of their consistency with CAFRA. Furthermore, in March 2001, DEP adopted specific criteria in N.J.A.C. 7:7E-5B.3(b) that it will use to review those boundary actions:
The Department shall not reject or reject and revise a boundary unless it finds that accepting the State Planning Commission approved boundary would result in unacceptable harm to the coastal ecosystem or the resources of the built or natural environment, or would otherwise be clearly inconsistent with the purposes of the Coastal Area Facility Review Act, N.J.S.A. 13:19-1 et seq., or this chapter. For those new or changed community development boundaries or new or changed core or node boundaries which are located within the Pinelands National Reserve, the Department shall also, in consultation with the New Jersey Pinelands Commission, determine whether the boundaries are consistent with the intent, policies and objectives of the National Parks and Recreation Act of 1978, P.L. 95-625, section 502, creating the Pinelands National Reserve, and the State Pinelands Protection Act of 1979 (N.J.S.A. 13:18A-1 et seq.).
The record supports a conclusion that DEP used the State Plan as it was intended, as a guide for reviewing and formulating its own CAFRA plan.
Nevertheless, appellants argue that the State Planning Commission's boundaries were adopted under the State Planning Act, which has many policies that are outside of those listed in CAFRA. Consequently, they charge DEP with failing to consider the specific CAFRA policies and resources when it incorporated the State Plan into the CAFRA regulations.
For support, appellants point to Last Chance Dev. P'ship v. Kean, 119 N.J. 425, 432-36, 575 A.2d 427 (1990), in which the Court invalidated DEP's amendments implementing the Waterfront Development Law, N.J.S.A. 12:5-3 to -11, because those amendments regulated the environmental effects of development and, thus, exceeded the Law's underlying purposes of regulating commerce and navigation along the waterfront. We are not persuaded by appellants' claim. Unlike the Waterfront Development Law, the powers delegated to DEP by CAFRA extend well beyond protection of the natural environment and require DEP to regulate land use within the coastal zone for "the general welfare." In re Egg Harbor Assocs., supra, 94 N.J. at 364, 464 A.2d 1115.
4. Lack of Technical or Factual Support for Coastal Centers' Delineation
Appellants also contend that DEP's delineation of coastal centers is invalid because there was no technical or factual support in the record for the actual boundaries drawn by DEP, or for its changing the size of those land areas during the proposal process. They claim that only a few of the files on the proposed coastal centers contained more than one or two aerial photography maps, none of the files contained an inventory or delineation of present resources, and none contained *241 an analysis or explanation of the impacts of the coastal center designations on those present resources or how those designations would serve to advance CAFRA's requirements. In fact, appellants assert that DEP did not consider the presence of existing approved sewer service areas.
Additionally, appellants claim that in the Coastal Rural and Coastal Environmentally Sensitive Planning Areas there are: (1) actual delineated coastal center boundaries that bisect developed areas and even single buildings, contrary to DEP's claim that it was going to delineate coastal center boundaries along readily observable physical features such as roads, water bodies, railroad lines and changes in development patterns; (2) actual coastal centers that were mostly comprised of undeveloped agricultural land, contrary to DEP's claim that coastal centers would be drawn conservatively with a less developed area adjacent to a compact development; (3) actual coastal centers that included undeveloped land that was probably not going to be developed soon, instead of DEP's claim that coastal centers would include empty land that was slated for imminent development; and (4) coastal towns that contained environmentally sensitive areas such as waters or wetlands, contrary to DEP's claims that it would seek to avoid including such areas as much as possible.
As to whether the specific boundaries of these coastal centers are arbitrary, we reject appellants' argument. We defer to DEP's expertise and to the fact that it spent years consulting the public and the local planning boards on these boundaries. Courts give due regard to the expertise of the agency, particularly where the issues involve highly technical considerations which are within the agency's field of expertise. Mayflower Secs. Co., Inc. v. Bureau of Secs., 64 N.J. 85, 93, 312 A.2d 497 (1973). We note, nevertheless, that there is evidence in the record that DEP: (1) reviewed aerial photographs, environmental data, municipal planning and regulatory documents for the coastal centers, 33 N.J.R. 853, and (2) rejected boundaries that would have included known habitats for threatened and endangered species, wetlands or bay islands, 32 N.J.R. 556. Moreover, DEP reduced the size of a coastal center after it was determined to contain environmental sensitive resources, 32 N.J.R. 561, and it eliminated a center identified in the State Plan but not subsequently included in a regional center, 32 N.J.R. 556. Thus, DEP's coastal center delineations are not arbitrary.
5. Coastal Centers and the Fair Housing Act
The Builders claim that DEP's use of its impervious cover percentages for its "coastal centers" will "result in inconsistencies with the Fair Housing Act," N.J.S.A. 52:27D-301 to -329, and the regulations of the New Jersey Council on Affordable Housing ("COAH"), N.J.A.C. 5:91-1.1 to -15.1. They claim that "some of these areas" that DEP has designated as "coastal centers" are subject to COAH, and that municipalities in those areas may be prevented from complying with COAH's regulations because of DEP's lower impervious cover percentages.
We disagree. There is no evidence in the record that there are any properties in the coastal zone where the Fair Housing Act, COAH's regulations, and DEP's new CAFRA regulations will be at odds or where municipalities will be unable to comply with all three. Furthermore, we note that COAH is required to "adhere to the policies delineated" in, among other things, the CPP and the CZM Rules, and that, according to COAH's regulations, municipalities may exclude "environmentally sensitive *242 lands" from their inventories. N.J.A.C. 5:93-4.2(e)(2)(I). In fact, a "suitable" site designated by a municipality for new construction, N.J.A.C. 5:93-5.3(b), is one that is "adjacent to compatible land uses, has access to appropriate streets and is consistent with the environmental policies delineated in N.J.A.C. 5:93-4." N.J.A.C. 5:93-1.3. Thus, we reject the Builders' inconsistency claim.
6. Violations of the APA
Appellants next contend that N.J.A.C. 7:7E-5B.3, which governs DEP's procedures and standards for reviewing new or changed boundaries established by the State Planning Commission violates the notice and comment requirements of the APA, N.J.S.A. 52:14B-4, and results in illegal rule-making. DEP claims that agencies are allowed to incorporate rules and standards by reference, even on a prospective basis.
Agencies are accorded "wide latitude in improvising appropriate procedures to effectuate their regulatory jurisdiction." Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 333, 478 A.2d 742 (1984). "[A]dministrative agencies possess the ability to be flexible and responsive to changing conditions." In re Pub. Serv. Elec. & Gas Co. Rate Unbundling, 167 N.J. 377, 385, 771 A.2d 1163, (2001) (citation omitted). "This flexibility includes the ability to select those procedures most appropriate to enable the agency to implement legislative policy." Ibid. (citation omitted). In that regard, "[a]n agency has discretion to choose between rule-making, adjudication, or an informal disposition in discharging its statutory duty." Northwest Covenant Med. Ctr. v. Fishman, 167 N.J. 123, 137, 770 A.2d 233 (2001).
Nonetheless, the manner in which the agency exercises its discretion in choosing an appropriate procedure may be governed by the procedural requirements of the APA. Ibid.; Metromedia, supra, 97 N.J. at 333-34, 478 A.2d 742; St. Barnabas Med. Ctr. v. New Jersey Hosp. Rate Setting Comm'n, 250 N.J.Super. 132, 142, 593 A.2d 806 (App.Div.1991). Not every action of a state agency constitutes rule-making. State v. Garthe, 145 N.J. 1, 7, 678 A.2d 153 (1996). Distinguished from rule-making is adjudication or informal agency action, which is defined as "any determination that is taken without a trial-type hearing, including investigating, publicizing, negotiating, settling, advising, planning, and supervising a regulated industry." Northwest Covenant Med. Ctr., supra, 167 N.J. at 136-37, 770 A.2d 233.
In contrast, the APA defines an "administrative rule" as an
agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intra-agency and interagency statements; and (3) agency decisions and findings in contested cases.

[N.J.S.A. 52:14B-2(e).]
In determining whether agency action constitutes rule-making our courts inquire whether the agency action:
(1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly *243 provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (I) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

[Metromedia, supra, 97 N.J. at 331-32, 478 A.2d 742.]
These factors are applicable whenever the authority of an agency to act without conforming to the requirements of the APA is questioned, for example, in adopting orders, guidelines, or directives. Doe v. Poritz, 142 N.J. 1, 97, 662 A.2d 367 (1995). However, not all of these factors must be present for an agency action to constitute rule-making; instead, the factors are balanced according to weight. Garthe, supra, 145 N.J. at 6, 678 A.2d 153. Applying the Metromedia factors here, we conclude that DEP does not engage in rule-making when it follows N.J.A.C. 7:7E-5B.3. To be sure, some Metromedia factors are present; however, most are not.
DEP's changed boundaries will not have "wide coverage" and will only effect the general public that lives in a particular coastal land area or is looking to purchase a property in a certain area. However, application of the second factor, which requires a showing that the action was "intended to be applied generally and uniformly to all similarly situated persons," weighs in favor of a finding of rule-making. Metromedia, supra, 97 N.J. at 331, 478 A.2d 742. The third factor, whether the action was designed to operate only prospectively, is present because DEP will apply the changed boundary to all new development.
Nevertheless, the remaining factors are not present. The boundaries do not prescribe "a legal standard or directive," a factor which deserves significant weight. See Doe v. Poritz, supra, 142 N.J. at 98, 662 A.2d 367 (according the greatest weight to this factor in assessing whether promulgation of guidelines constituted rule-making). Similarly, factor five, whether the action reflects a material change in administrative policy, was not satisfied. DEP's change to a particular boundary on its CAFRA Planning Map does not constitute a material change in policy; it is simply a change to planning development. And finally, the sixth Metromedia factor was not satisfied because the sample does not represent "a decision on administrative regulatory policy in the nature of the interpretation of law or general policy." Metromedia, supra, 97 N.J. at 331-32, 478 A.2d 742.
We conclude, therefore, that DEP's adoption of a new or changed boundary that had first been accepted by the State Planning Commission was not rule-making. Nevertheless, we note that once approved by DEP, a boundary change is a public record and can be challenged by any affected person. There is, however, no evidence in the record of any such challenges, and indeed here, appellants do not challenge a specific adoption by DEP of a changed boundary by the State Planning Commission.
Moreover, we are satisfied that DEP's procedures are different from those of the New Jersey Pinelands Commission in In re Certification of Master Plan and Land Use Ordinances of the Tp. of Berkeley, 214 N.J.Super. 390, 519 A.2d 901 (App.Div. 1986). There, the appellants appealed the Commission's reclassification of forest area as a rural development area. Id. at 392, *244 519 A.2d 901. We concluded that such redesignation could "only be accomplished through formal amendment to the [Comprehensive Management Plan] so that there can be a full hearing upon proper notice thereby permitting a full determination as to whether the change is justified." Id. at 396, 519 A.2d 901. In our view, the difference here is that DEP is reacting to the changes already made by the State Planning Commission; thus, the parties affected by that change are already on notice that DEP will be acting under N.J.A.C. 7:7E-5B.3(b).
We are satisfied that DEP's procedures in N.J.A.C. 7:7E-5B.3 for reviewing and incorporating in its own CAFRA Planning Map the new or changed boundaries established by the State Planning Commission does not constitute illegal rule-making in violation of the APA.
Moreover, the Realtors argue that DEP failed to provide any analysis of the effect of the rule changes or their expected social, economic, environmental, or job impact in violation of the APA. We disagree.
The APA provides that prior to the adoption, amendment or repeal of any rule, an agency shall provide notice of "the terms or substance" of its intended action. N.J.S.A. 52:14B-4(a)(1). The agency must also
[p]repare for public distribution at the time the notice appears in the [New Jersey] Register a statement setting forth a summary of the proposed rule, a clear and concise explanation of the purpose and effect of the rule, the specific legal authority under which its adoption is authorized, a description of the expected socio-economic impact of the rule, a regulatory flexibility analysis, or the statement of finding that a regulatory flexibility analysis is not required, as provided in section 4 of P.L.1986, c. 169 (C. 52:14B-19), a jobs impact statement which shall include an assessment of the number of jobs to be generated or lost if the proposed rule takes effect, and an agriculture industry impact statement as provided in section 7 of P.L.1998, c. 48 (C. 4:1C-10.3).

[N.J.S.A. 52:14B-4(a)(2) (emphasis added).]
The purpose of this procedure is "to give those affected by the proposed rule an opportunity to participate in the rule-making process not just as a matter of fairness but also as `a means of informing regulators of possibly unanticipated dimensions of a contemplated rule.'" Federal Pac. Elec. Co., supra, 334 N.J.Super. at 340-41, 759 A.2d 851 (quoting In re Adoption of Regulations Governing Volatile Organic Substances in Consumer Prods., N.J.A.C. 7:27-23, 239 N.J.Super. 407, 411, 571 A.2d 971 (App.Div.1990)). We conclude that DEP satisfied the statutory mandate.
In our view, DEP's socio-economic impact statement at 31 N.J.R. 2061-62 was sufficient to inform appellant because it set forth the impact that DEP "anticipated" or expected from the proposed regulations. N.J.S.A. 52:14B-4(a)(2) does not require a more convincing socio-economic impact analysis. In addition, we are satisfied that DEP's job-impact statement at 31 N.J.R. 2063-64 was sufficient. DEP clearly stated that it "anticipates that the proposed rules will have no impact on the number of jobs in the State." 31 N.J.R. 2063 (emphasis added).
Moreover, appellant was provided with ample notice and opportunity to comment on the proposal. These regulations in their many versions were the subject of notice and discussion for over six years, during which there were repeated opportunities for public comment, hearing and debate.
*245 E. DEED RESTRICTIONS
Finally, we address the Realtors' claim that DEP exceeded its authority by enacting N.J.A.C. 7:7E-5.4, which permits it to impose a deed restriction as a condition of obtaining a CAFRA permit. N.J.A.C. 7:7E-5.4(d) governs vegetative cover requirements for sites in the upland waterfront development and CAFRA areas:
[W]hen trees are required to be planted or preserved under N.J.A.C. 7:7E-5A or 5B, the trees shall be planted and/or preserved in a tree cluster as follows:
1. Trees preserved and/or planted shall be located in a cluster within the boundaries of one lot that shall not be further subdivided. However, on a site with existing non-contiguous forested areas larger than five acres each, the Department may require that a tree cluster be preserved on a lot located in each of the forested areas. The tree cluster should, to the maximum extent practicable, be adjacent to existing on-site or off-site forests or other natural resources, such as critical wildlife habitat areas as defined at N.J.A.C. 7:7E-3.39, or water bodies;
2. The boundaries of the tree cluster shall be clearly marked with permanent, visible markers such as concrete blocks or posts, metal stakes, or other easily seen, permanent, immovable markers;
3. The tree cluster shall be protected from any future development by a recorded conservation restriction, which requires that the tree cluster be preserved in its natural state, and prohibits removal or clearing of dead trees greater than five inches in diameter at four and one-half feet above ground except to prevent a safety hazard; and which prohibits removal, clearing or mowing of live vegetation, including trees, unless it is demonstrated to the Department that such removal will result in habitat enhancement;

4. For a residential development of 25 units or more, the recorded conservation restriction required under (d)3 above, shall be enforceable by the Department and:
I. A local public entity;
ii. A private nonprofit organization whose trustees have no other interest in the land; or
iii. A homeowner's association; and
5. For a non-residential development, the recorded conservation restriction required under (d)3 above shall be enforceable by the Department and a local public entity or a private nonprofit organization whose trustees have no other interest in the land, unless no such entity or organization will agree to enforce the conservation restriction.

[Emphasis added.]
N.J.A.C. 7:7E-5.4 does not apply to sites: (1) in the northern waterfront region or urban area region in the upland waterfront development area; (2) in a CAFRA center, CAFRA core, or CAFRA node; (3) in a residential development of twenty-four units or fewer that is not part of a larger development; or (4) where the amount of required trees is smaller than one acre.
For support of its argument that the Legislature must expressly grant the power to invoke conservation restrictions in deeds, appellant cites to Gardner v. New Jersey Pinelands Comm'n, 125 N.J. 193, 593 A.2d 251 (1991). There, our Supreme Court held that a regulation promulgated by the Pinelands Commission, that limited development to one home per forty acres, with a mandatory clustering option that allowed construction on one-acre lots and required the remaining thirty-nine acres to be permanently dedicated to agricultural *246 use, was not a taking. Id. at 204, 593 A.2d 251. The Court found, as appellant correctly notes, that the required deed restriction was a constituent part of the regulatory scheme itself. Id. at 209, 593 A.2d 251. In fact, N.J.S.A. 13:18A-8(d)(1) of the New Jersey Pinelands Protection Act, N.J.S.A. 13:18A-1 to -29, expressly gives the Pinelands Commission the broad power to invoke "a variety of land and water protection and management techniques, including but not limited to ... acquisition of conservation easements and other interest [sic] in land, ... transfer of development rights, dedication of private lands for recreation or conservation purposes."
We disagree with appellant. Although CAFRA does not expressly authorize a deed restriction, an administrative agency possesses "expressly granted" powers and "those incidental powers which are reasonably necessary or appropriate to effectuate the specific delegation." New Jersey Guild of Hearing Aid Dispensers, supra, 75 N.J. at 562, 384 A.2d 795 (quoting In re Regulation F-22 of the Office of Milk Indus., 32 N.J. 258, 261, 160 A.2d 627 (1960)). "Where there exists reasonable doubt as to whether such power is vested in the administrative body, the power is denied." In re Closing of Jamesburg High Sch., 83 N.J. 540, 549, 416 A.2d 896 (1980). Nevertheless, courts should liberally construe the grant of authority to an administrative agency. New Jersey Guild of Hearing Aid Dispensers, supra, 75 N.J. at 562, 384 A.2d 795.
N.J.S.A. 13:19-20 states that CAFRA "shall be liberally construed to effectuate" its purpose and intent. In addition, N.J.S.A. 13:19-19 provides that CAFRA "shall be regarded as supplemental and in addition to powers conferred by other laws," which includes the Pinelands Protection Act, which grants the power to require conservation restrictions. See N.J.S.A. 13:18A-8d(1).
Furthermore, DEP's power in this regard can be gleaned from N.J.S.A. 13:19-11, which gives the Commissioner the power to deny a CAFRA permit if the proposed development would contribute to an already serious level of environmental degradation or resource exhaustion, or in the alternative to grant the proposed development a CAFRA permit "subject to such conditions as the commissioner finds reasonably necessary to promote the public health, safety and welfare, to protect public and private property, wildlife and marine fisheries, and to preserve, protect and enhance the natural environment." Ibid. (emphasis added).
Moreover, the deed restriction for tree preservation in N.J.A.C. 7:7E-5.4 is a conservation strategy. According to DEP, the requirement for a deed restriction is based on its experience in implementing the prior regulations, during which requirements of tree preservation were often ignored after development. A conservation restriction serves to notify future land owners of the requirement. Additionally, DEP notes that the condition to cluster the trees was intended to create a block of forest, which provides superior and more varied wildlife habitat than a narrow band of trees scattered throughout a development site. 32 N.J.R. 536; 31 N.J.R. 2055.
In Gardner, supra, the Court found that the government has a legitimate interest in protecting environmentally sensitive property, 125 N.J. at 205-06, 593 A.2d 251, and that no taking occurred simply by virtue of the diminished value of the land or its lack of marketability due to the conservation restriction. Id. at 210, 593 A.2d 251. Applying that rationale here, we are satisfied that the power to impose a deed restriction is an incidental power which is reasonably necessary or appropriate for DEP to carry *247 out its CAFRA responsibilities. Hence, we conclude that DEP did not violate its authority here.
We affirm in part and reverse and remand in part.
NOTES
[1] We have changed the caption to conform to the ones in the other back-to-back cases associated with this appeal.
[2] The New Jersey State Planning Commission and the Office of State Planning were established in 1986 by the State Planning Act, N.J.S.A. 52:18A-196 to -207. That act called for a State Development and Redevelopment Plan [the State Plan] to be prepared through a statewide planning process called "cross-acceptance," N.J.S.A. 52:18A-196, -202, and -202.1, which means "a process of comparison of planning policies among governmental levels with the purpose of attaining compatibility between local, county and State plans." N.J.S.A. 52:18A-202.
[3] See N.J.A.C. 7:7E-5A.9 and -5A.10, Tables D, E, F, and G.
[4] If a site or portion of a site is unforested, the impervious cover limit is the greater of (1) the acreage of net land multiplied by the percentage listed in the table or (2) the amount of legally existing impervious cover located on the site. N.J.A.C. 7:7E-5A.9(b).
[5] The latest version of and most detailed information on the State Plan and the Executive Summary and the laws and regulations governing the State Planning Commission is available at the State Planning Commission's Home Page, http://www.njstateplan.com. The home page states that it was last updated on January 25, 2002. Accordingly, the web site has been relied upon for this information.
[6] The State Planning Commission recently amended its regulations. Those regulations are cited herein. 34 N.J.R. 285-97 (January 7, 2002) (adoption); 33 N.J.R. 1511-24 (May 21, 2001) (proposal).
[7] The plans eligible for endorsement are: master plans of municipalities and counties, municipal strategic revitalization plans, urban complex strategic revitalization plans, regional strategic plans and state agency functional plans. N.J.A.C. 17:32-7.2(b). A municipal plan may be endorsed as part of a regional plan. N.J.A.C. 17:32-7.2(c).
[8] DEP originally adopted this section as N.J.A.C. 7:7E-5B.2 on February 7, 2000. 32 N.J.R. 503, 579. In that regulation, DEP could only accept or reject a boundary formally approved or changed by the State Planning Commission; there was no provision for DEP to modify that boundary. N.J.A.C. 7:7E-5B.2(a) (amended 2001). If DEP accepted the Commission's new boundary, it simply had to publish notice of that acceptance. N.J.A.C. 7:7E-5B.2(b) and (c) (amended 2001). If DEP rejected the Commission's new boundary, DEP had to promulgate an amendment in accordance with the APA. N.J.A.C. 7:7E-5B.2(d) and (e) (amended 2001).

The regulation was recodified to N.J.A.C. 7:7E-5B.3 and substantially amended on March 5, 2001. 33 N.J.R. 843-69 (March 5, 2001) (adoption). Despite this fact, appellants focus their challenges on the regulation before it was amended. This opinion, however, concentrates on the newest version.
[9] See N.J.A.C. 7:7E-5B.4, Table H and5B.5, Table I.
[10] For more detailed information, see the State Planning Commissioner's Home Page, supra, note 5.
[11] See website cited supra, note 5.
[12] Ibid.